CONTINENTAL ILLINOIS CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Continental Illinois Corp. v. Commissioner
Docket No. 5931-83
United States Tax Court
T.C. Memo 1991-66; 1991 Tax Ct. Memo LEXIS 85; 61 T.C.M. (CCH) 1916; T.C.M. (RIA) 91066; February 21, 1991, Filed *85 Decision will be entered under Rule 155. Held: Petitioner is not entitled to certain foreign tax credits both where petitioner failed to substantiate that the withholding tax was paid and where the foreign borrower had no legal liability to withhold and pay such tax. Held further, petitioner is entitled to certain other foreign tax credits where petitioner provided evidence that withholding taxes were paid. Held further, petitioner's income accruals were proper in the amount of $ 4,809,179, but were improper where foreign borrowers had no legal liability for payment of withholding taxes. Edward C. Rustigan, Joel V. Williamson, and Roger J. Jones, for the petitioner. Beth L. Williams, Robert A. Bedore, Cynthia J. Mattson, Grace L. Perez-Navarro, and Eli J. Dicker, for the respondent. WHITAKER, Judge. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION By statutory notice dated December 20, 1982, respondent determined deficiencies in petitioner's Federal income tax as follows: Year
Deficiency
1975
$ 1,899,880
1976
84,088
1977
36,741,206
1978
15,844,349
1979
3,896,519
Certain issues in the case were severed, separately tried, and resolved pursuant to opinions of this Court which previously have *86 been filed. See Continental Illinois Corp. v. Commissioner, T.C. Memo 1988-318, pertaining to the Brazilian foreign tax credit issue, and Continental Illinois Corp. v. Commissioner, 94 T.C. 165 (1990), pertaining to the "Iranian Loss" issue. The remaining issues in the case (i.e., the "Non-Iranian Loss" issues), involving only the years 1977 through 1979, were tried at a special trial session in Washington, D.C., which commenced on May 8, 1989. In Continental Illinois Corp. v. Commissioner, T.C. Memo 1989-636, we resolved those remaining issues which arose in connection with the so-called CAP Loans. The only other remaining issues arose in connection with the so-called Net Loans. This opinion covers these issues. The Net Loan issues for decision are: (1) The amount of foreign tax credits allowable to petitioner pursuant to section 901; [1] *87 and (2) whether, to the extent foreign tax credits are disallowed, petitioner is entitled to a corresponding reduction of the additional interest income which was accrued and reported in connection with such loans. Certain evidentiary issues arising in connection with the Net Loan issues were resolved pursuant to Continental Illinois Corp. v. Commissioner, T.C. Memo 1989-468, which is incorporated herein by this reference. FINDINGS OF FACT Background
Some of the facts have been stipulated and are found accordingly. The stipulations and exhibits attached thereto are incorporated herein by this reference except as otherwise provided in the order which was issued in conjunction with our opinion resolving the evidentiary issues. Petitioner is a Delaware corporation which had its corporate headquarters in Chicago, Illinois, at the time it filed its petition. Petitioner and its affiliated corporations maintained their books and records and filed their consolidated tax returns on a calendar-year basis using the accrual method of accounting. Petitioner's consolidated group included Continental Illinois National Bank and Trust Company of Chicago (CINB), a Federally chartered national banking association wholly owned by petitioner. CINB made loans to various entities in foreign countries in the course of its regularly *88 conducted banking activities. [2] CINB competed with other lenders from the United States, Europe, Canada, and Japan who also made loans abroad. The competition kept CINB from charging interest rates significantly different from the interest rates charged by other lenders. Loans extended by CINB to foreign borrowers fell into two categories: "gross quoted loans" and "net quoted loans," both referred to herein as "net loans." Pursuant to a gross quoted loan agreement, the borrower agreed to pay a gross quoted rate of interest to which CINB was entitled before the imposition of any tax on such interest by the borrower's country. Generally such agreements called for payment of interest semiannually over the term of the loan at a rate quoted as a spread (e.g., 2 points) above the London Interbank Offered Rate (LIBOR). LIBOR was CINB's cost of funds. If any tax was imposed on *89 interest due to CINB, the borrower paid such interest at the gross quoted rate net of tax. [3]
Pursuant to a net quoted loan agreement, the borrower assumed the obligation to pay any tax imposed by the borrower's country on interest due to CINB as consideration to be paid for the loan in addition to the net quoted rate of interest. Generally such agreements called for payments of interest semiannually over the term of the loan at a rate quoted as a spread (e.g., 1 point) above LIBOR. Under a net quoted loan agreement the borrower was contractually obligated to absorb all foreign taxes imposed on interest due to CINB and CINB was entitled to receive interest payments at the net quoted rate free of all foreign taxes. With one exception, [4] *91 *92 the foreign tax credits and additional interest income in question in this case relate to net quoted loans which CINB extended to 380 borrowers in 39 foreign countries. Each of those countries imposed a withholding *90 tax [5] on interest paid or owed by borrowers in connection with loans from nonresident lenders such as CINB. [6] *93 Borrowers were obligated to withhold taxes at the source [7] and to pay the withheld taxes to the proper governmental authority. CINB neither filed tax returns in connection with the withholding taxes imposed on interest payments received from foreign borrowers nor paid such taxes directly. Since July 1985, no attempt has been made by foreign tax authorities to collect unpaid withholding taxes from CINB. [8] We assume that if efforts had been successfully made with respect to the years before the Court, the credits would be allowed for the year or years in which paid. The difference between a gross quoted loan and a net quoted loan *94 is that with respect to the former the quoted interest rate is a gross rate which does not guarantee the lender a fixed return after deduction of the withholding taxes (i.e., the lender bears the risk of an increase in the withholding tax rate), whereas with respect to the latter, the quoted interest rate is net of withholding taxes (i.e., the borrower bears the risk of an increase in the withholding tax rate). The laws of all of the countries in issue, except Indonesia and Thailand, required that a gross-up adjustment [9] *95 be made with respect to a net quoted loan in order to reflect assumption by the borrower of the obligation to pay tax imposed by the borrower's country on interest paid or due to the lender. [10] In Indonesia and Thailand, neither of which required a gross-up adjustment, withholding tax was imposed on net interest paid or due to the lender. The statute of limitations for the collection of unpaid withholding taxes has expired in 28 of the 39 countries for which amounts of foreign tax credit and additional interest income are in issue. The applicable statutes of limitations remain open in Ghana, Malaysia, Panama, and South Africa. [11]
Financial Reporting by CINB of Loans Made Abroad
Gross Loans
During the years in issue (i.e., 1977 through 1979), CINB classified gross quoted loans and net quoted loans with respect *96 to which borrowers had provided evidence of payment of withholding taxes as "gross loans" for financial reporting purposes. For gross quoted loans, CINB accrued interest income at the gross quoted rate, without any reduction for withholding taxes. For net quoted loans with respect to which borrowers had provided evidence of payment of withholding taxes, CINB accrued interest income at the net quoted rate plus a gross-up adjustment to reflect the amount of withholding taxes paid by borrowers on CINB's behalf. With respect to net quoted loans, CINB followed a conservative approach pursuant to which additional interest income was accrued only if the borrower provided a tax receipt reflecting satisfaction of a withholding tax obligation. CINB also accrued withholding taxes as an expense incurred in connection with loans which were classified as gross loans. Net Loans
During the years in issue, CINB classified all of its other loans to foreign borrowers, specifically net quoted loans with respect to which borrowers had not provided evidence of payment of withholding taxes (i.e., tax receipts), as "net loans" for financial reporting purposes. For net loans, CINB accrued interest income *97 at the net quoted rate of interest. CINB neither made gross-up adjustments of interest income to reflect borrowers' obligations to pay withholding taxes on CINB's behalf nor accrued withholding taxes as an expense unless borrowers provided tax receipts. CINB compiled a list of net loans in what is hereinafter referred to as the Gold Book. Tax Reporting by CINB of Loans Made Abroad
Gross Loans
For the years in issue, CINB included in income the amount of interest reported on its books with respect to loans which were classified as gross loans. CINB also claimed foreign tax credits for withholding taxes imposed on interest payments made in connection with such loans (excluding loans made to Brazilian borrowers) as follows: Taxable Year
Amount of Foreign Tax Credit
1977
$ 4,244,538 1978
7,444,217
1979
14,642,663
Total      $ 26,331,418
Respondent allowed all of those foreign tax credits when petitioner's returns were examined. Net Loans
For the years in issue, CINB included in income the amount of interest reported on its books with respect to loans which were classified as net loans. CINB also grossed up the interest income reported with respect to such loans to reflect assumption by borrowers *98 of the obligation to pay taxes on CINB's behalf. Notwithstanding the fact that borrowers had not provided evidence of payment of withholding taxes on CINB's behalf in connection with loans classified as net loans, [12] CINB claimed foreign tax credits for withholding taxes imposed on the grossed up interest income (excluding loans made to Brazilian borrowers) as follows: Taxable Year
Amount of Foreign Tax Credit
1977
$ 6,786,476 1978
9,778,577
1979
5,588,782
Total      $ 22,153,835
Net Loan Study
For taxable years ending prior to 1976, CINB neither grossed up the interest income from net quoted loans nor claimed any foreign tax credits in connection with such loans. In Private Letter Ruling 7611239900A, dated November 23, 1976, the Internal Revenue Service responded to a ruling request regarding the creditability under section 901 of income tax imposed on interest paid to a domestic commercial bank (not CINB) pursuant to gross quoted loans and *99 net quoted loans extended to Brazilian borrowers. CINB reconsidered its method of reporting net quoted loans for tax purposes in light of Private Letter Ruling 7611239900A and decided to gross up interest income from net quoted loans and to claim a corresponding amount of foreign tax credits. CINB realized that recognition of additional interest income coupled with claims for corresponding amounts of foreign tax credits presented an opportunity to improve "the corporate bottom line." However, CINB had some concern about the possibility of including additional interest income and being denied the corresponding foreign tax credits. CINB subsequently commenced an extensive study of loans outstanding from 1969 through 1977 [13] *101 for the purpose of determining the amount of additional interest income which should have been included and the amount of foreign tax credits which should have been claimed in connection with net quoted loans. [14] The first phase of the net loan study for the taxable year 1976 was completed in mid-1977, prior to the time petitioner filed its Federal income tax return for that year. CINB's International Banking Department indicated in an interoffice memorandum dated *100 September 23, 1977, that as a result of such study petitioner included over $ 5 million of additional interest income and claimed an equal amount of foreign tax credits (excluding loans made to Brazilian borrowers) on its return for the taxable year 1976. The first phase of the net loan study for the taxable year 1977 yielded similar results. CINB's International Banking Department directed an interoffice memorandum dated April 5, 1978, to CINB's Tax Department indicating that the "additional interest income and withholding taxes for the year [1977] amounts to $ 9,797 thousands." [15] CINB calculated the amount of additional interest income and foreign tax credits in the first phase of the net loan study for 1976 and 1977 by applying what was believed to be the prevailing withholding tax rate to the net interest paid or due on the principal balance of outstanding net quoted loans. Such computations generally included gross-up adjustments to reflect the assumption by borrowers of the obligation to pay taxes on CINB's behalf. CINB's International Banking Department outlined the second phase of the net loan study in an interoffice memorandum dated April 5, 1978, as follows: I. Compare 1977 list of net quoted loan customers with the 1976 study. Review all exceptions and develop common list to obtain past interest income amounts. The process assumes that a customer who obtained a net quoted loan from us during 1976 and 1977 also had net quote arrangements in the past years. II. Obtain interest income and compute withholding taxes on above customers from 1969 to 1975. We will also review all past customers who did not borrow money from *102 us during 1977 and 1976. III. Set up a procedure with respective lending officers to review loan documentations and to communicate with the customers to obtain documentations (original or xerox copy of the tax receipt or letter from customer for the amount of taxes paid) from customers as to the taxes paid on behalf of the bank. Phases I and II are expected to be completed by August 1978 and phase III will be completed prior to December 1978. The project has very high priority in the International Banking Department.
In early 1978, CINB undertook the second phase of the net loan study. The second phase entailed an attempt to determine the amount of net interest received by CINB pursuant to net quoted loans outstanding during 1969 through 1975, calculation of the amount of withholding tax imposed on such interest, as adjusted to reflect the assumption by borrowers of the obligation to pay taxes on CINB's behalf, and an effort to collect documentation to substantiate payment of withholding taxes by borrowers for all years under study. CINB later added net quoted loans outstanding during 1978, 1979, and beyond to the net loan study, which took approximately 3 years to complete. The *103 net loan study dealt with several thousand loans which had been extended by CINB to between 500 and 700 different borrowers in approximately 50 countries. First, CINB attempted to identify countries in which net quoted loans had been made that imposed a withholding tax on interest paid or due to nonresident lenders. Second, CINB reviewed its loan accrual records for the purpose of determining the amount of interest payments received from borrowers in those countries and the period of time covered by such payments. That review required a search through voluminous manual ledgers where CINB had recorded the receipt of approximately 25,000 interest payments from foreign borrowers for years under study. Third, CINB attempted to identify and eliminate from the study interest payments made pursuant to gross quoted loans. Fourth, CINB attempted to identify and eliminate from the study interest payments which were exempt from withholding tax. Fifth, CINB calculated the amount of additional interest income and foreign tax credits by applying what was believed to be the prevailing withholding tax rate to the interest payments remaining under study, as adjusted to reflect assumption by borrowers *104 of the obligation to pay taxes on CINB's behalf. Sixth, CINB attempted to obtain documentation substantiating the payment of withholding taxes on its behalf by borrowers who assumed the obligation to pay such taxes pursuant to net quoted loan agreements. Prior to undertaking the net loan study, CINB made no effort to document for purposes of claiming foreign tax credits the amount of withholding taxes paid on CINB's behalf by borrowers with net quoted loans outstanding. Only certain net quoted loan agreements required borrowers to provide CINB with tax receipts documenting the payment of withholding taxes to the proper governmental authorities on CINB's behalf. CINB's International Banking Department maintained loan files in which tax receipts provided by borrowers were kept. CINB's International Banking Department forwarded other borrower-provided tax receipts to CINB's Tax Department together with information regarding the amount of the corresponding interest payments and the period to which such payments applied. CINB succeeded in documenting a significant amount of the foreign tax credits claimed with respect to net quoted loans simply by locating tax receipts which were already *105 on file. CINB encountered difficulty obtaining the sought-after documentation from other borrowers, particularly those who were not required under the terms of the net quoted loan agreements to provide tax receipts. CINB's documentation efforts initially involved between 25 and 30 loan officers. CINB instructed those loan officers to contact borrowers and request the following documentation in order of preference: (1) Original tax receipts; (2) copies of tax receipts; or (3) written certification that withholding taxes were paid on CINB's behalf. Documentation problems stemmed from the reluctance of borrowers to cooperate and the mere passage of time. [16] CINB's attempts to match tax receipts to interest payments on particular loans were complicated by the fact that some borrowers had both net quoted loans and gross quoted loans outstanding; large loans were often syndicated with other lenders; and borrowers' books reflected relevant amounts in foreign denominations. The difference in time between payment and receipt of interest and between payment of interest and payment of withholding taxes further complicated CINB's documentation efforts. CINB also sought to keep borrowers from *106 taking their business elsewhere by not pushing too hard to obtain tax receipts. CINB summarized the results of the net loan study in the Gold Book, which included net quoted loans with respect to which borrowers had not provided evidence of payment of withholding taxes. The amounts of foreign withholding taxes calculated as a result of the net loan study were reported as additional interest income on Schedule M of petitioner's consolidated Federal income tax return for each of the years in issue in this case. The same amounts were claimed as foreign tax credits on the Forms 1118, which accompanied petitioner's return for each of those years. Respondent's Determination
In the notice of deficiency, respondent disallowed certain foreign tax credits claimed by CINB for 1977, 1978, and 1979. Some of those credits were disallowed because the underlying interest on net quoted loans was exempt from withholding tax and other such credits were disallowed *107 for lack of substantiation. Respondent reduced CINB's additional interest income to reflect disallowance of foreign tax credits due to the exemption of interest on net quoted loans from withholding tax. Based on the production by CINB of tax receipts, respondent allowed certain foreign tax credits which had not previously been claimed and increased CINB's additional interest income by an equal amount. Based on the production by CINB of other unspecified documents, respondent subsequently allowed certain foreign tax credits which had been disallowed for lack of substantiation. Certain foreign tax credits, which respondent disallowed for lack of substantiation, correspond to interest on net quoted loans that was wholly or partially exempt from withholding tax. The exemption of interest on net quoted loans from withholding tax necessitates a reduction in both the amount of additional interest income and the amount of foreign tax credits. Subsequent Documentation Efforts
CINB initially sought documentation to substantiate foreign tax credits as part of its 3-year net loan study. During trial preparation, CINB, with the assistance of petitioner's counsel, attempted to obtain documentation *108 substantiating certain foreign tax credits disallowed by respondent and additional foreign tax credits which were claimed pursuant to petitioner's Second Amendment to Petition filed May 5, 1989. Petitioner's counsel retained Miguel Antonio Valdes, an international tax partner with the accounting firm of Coopers & Lybrand, to meet with borrowers in Latin America, Spain, Portugal, and Italy on CINB's behalf for the purpose of obtaining foreign tax credit documentation. [17] G. Robert Vlach, CINB's tax controller for Latin America, made the arrangements for Mr. Valdes to meet with major borrowers and he accompanied Mr. Valdes to most of those meetings. Mr. Valdes met with approximately 100 borrowers in eight countries in pursuit of foreign tax credit documentation. During meetings with borrowers, most of which took place during 1987 and 1988, Mr. Valdes explained that CINB was involved in a dispute over foreign tax credits with the Internal Revenue Service and he always requested that borrowers *109 provide him with tax receipts if such receipts were still available. In some instances, borrowers informed Mr. Valdes that tax receipts were not retained because the period for the collection of withholding taxes had expired. In the event tax receipts were unavailable, Mr. Valdes sought written certifications from borrowers, based on their own books and records, that net quoted loans were received from CINB, withholding taxes were imposed on net quoted loan interest payments, and such taxes were paid on behalf of CINB. To ease the burden on borrowers who were under no obligation to provide CINB with the documentation which it sought, or who were otherwise unwilling or unable to do so without some assistance, representatives of CINB and petitioner's counsel prepared schedules for each borrower purportedly showing the amount of withholding tax that should have been paid on CINB's behalf. Those schedules, which purportedly reflected net interest payments, the amount of withholding tax imposed on interest payments, and interest as adjusted to reflect assumption of the obligation to pay withholding taxes on CINB's behalf, were based upon CINB's books and records and what was believed *110 to be the prevailing withholding tax rate. Mr. Valdes requested that borrowers verify the schedules against their own books and records before making written certifications of the amounts in question. Mr. Valdes also made available various form letters which petitioner's counsel prepared as a guide for borrowers providing written certifications. None of the form letters described a situation in which the withholding taxes had not been paid by a borrower or made any reference to whether the statute of limitations on collection of the withholding taxes in question had run. Borrowers did not generally respond immediately and Mr. Valdes often met with borrowers on more than one occasion while attempting to obtain the sought-after documentation. Mr. Valdes requested neither to examine nor to copy the books and records of borrowers. On several occasions, however, borrowers permitted Mr. Valdes and Mr. Vlach to participate in a review of relevant portions of their books and records. CINB dispatched Frederick C. Yeager, a vice president in charge of CINB's International Tax Department, to meet with borrowers in the Asia/Pacific region. Mr. Yeager made one trip during which he met with 24 *111 borrowers in Indonesia, the Philippines, and Thailand. Letters requesting assistance in documenting the payment of withholding taxes on behalf of CINB were sent to borrowers in advance of such meetings. [18] *112 After indicating in those letters that the documentation was required by the Internal Revenue Service, CINB requested that the borrowers provide tax receipts, if available. In certain letters, CINB requested written certifications in the event tax receipts were unavailable and attached thereto an example of the type of certification which was expected to be provided by the borrower. CINB also attached a schedule purportedly showing the amount of tax that should have been paid on CINB's behalf by the particular borrower together with a document purportedly certifying that such schedule accurately reflected the amounts shown on CINB's books and records. Cecilia M. Kurtzweil, CINB's legal documents supervisor, certified such schedules as accurate without independently verifying any of the information presented therein. On his trip to the Asia/Pacific region, Mr. Yeager discussed CINB's situation with the borrower representatives whom he met and renewed the request for tax receipts. If the borrower indicated that tax receipts were not available, Mr. Yeager requested a written certification regarding the payment of withholding taxes by that borrower on CINB's behalf. Although he did not request copies of borrowers' books and records, Mr. Yeager attempted to ascertain whether borrowers still maintained books and records relevant to the net quoted loan transactions in question. Mr. Yeager did not attempt to secure any form of foreign tax credit documentation from foreign tax authorities to whom borrowers had purportedly paid withholding taxes on behalf of CINB. Messrs. Valdes and Yeager, working together with representatives of CINB and petitioner's counsel, obtained a number of "Borrower Letters" (i.e., written certifications) from high ranking officers of foreign banks and corporations who were authorized to issue those letters because of their responsibility for or familiarity with the withholding tax practices of the entities *113 which they represented. Although Messrs. Valdes and Yeager declined in most instances to inform borrowers that documentation being sought by CINB was for use in litigation, all of the borrowers from whom CINB obtained Borrower Letters were aware of CINB's dispute with the Internal Revenue Service over foreign tax credits. Amounts Remaining in Issue After Subsequent Documentation Efforts[19] *114 The total amount of additional interest income and the total amount of foreign tax credits remaining in issue in this case both equal $ 7,938,983. [20]
Petitioner offered no borrower *115 provided documentation as substantiation for additional interest income and foreign tax credits in amounts as follows: 1977
$ 821,225  1978
1,535,158
1979
642,127
Total     $ 2,998,510 Petitioner offered Borrower Letters provided to CINB by nine borrowers in Argentina, the Philippines, Venezuela, and Thailand as substantiation for additional interest income and foreign tax credits in amounts as follows: 1977
$ 23,069
1978
72,374
1979
35,851
Total     [21] *116 $ 131,294 Borrower Letters provided to CINB by Petroleos Mexicanos (PeMex), a major Mexican borrower, and certain other documents, pertain to additional interest income and foreign tax credits in amounts as follows: 1977
$ 1,299,713
1978
1,326,871
1979
1,184,129
Total      $ 3,810,713
A Borrower Letter provided to CINB by Comision Federal de Electricidad (CFE), another major Mexican borrower, and certain other documents, pertain to additional interest income and foreign tax credits in amounts as follows: 1977
$ 274,656
1978
341,356
1979
382,454
Total      $ 998,466
Argentina
Banco de Italia y Rio de la Plata
On a trip to Argentina during the week of July 16, 1988, Mr. Valdes met with Hipolito Manfredi and Dr. Carlos E. A. Tenaillon, officers of Banco Central de la Republica Argentina (the central bank of Argentina) assigned to monitor the liquidation of Banco de Italia y Rio de la Plata (Banco de Italia). Mr. Valdes requested that tax receipts be provided for purposes of substantiating payments of withholding taxes by Banco de Italia on behalf of CINB. Banco de Italia provided only *117 one tax receipt. [22] CINB subsequently received a Borrower Letter from Banco de Italia dated July 28, 1988, directed to the attention of Ms. Kurtzweil. The pertinent portion of that letter reads as follows: ""By means of this letter we certify that payments [of] taxes on behalf of Continental Illinois National Bank, has been made in due course on the following transactions.""
Period
Net Interest Accrued
Taxes Withheld
Gross Interest
Accrued
1977 1.541,65
195,42
1.737,07
1978
28.170,12
3.570,86
31.740,98
1979
17.954,80
2.275,96
20.230,76
Mr. *118 Manfredi and Dr. Tenaillon both signed the Borrower Letter on behalf of Banco de Italia. The total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to Banco de Italia both equal $ 4,762. Those total amounts include $ 195 for 1977 and $ 4,567 [23] for 1978. Banco de Mendoza
On that same trip to Argentina, Mr. Valdes met with Mabel A. Antonucci and Cesar C. Lopez, the officers of Banco de Mendoza in charge of foreign borrowing. Mr. Valdes requested that tax receipts be provided for purposes of substantiating payments of withholding taxes by Banco de Mendoza on behalf of CINB. After ascertaining that tax receipts could not be provided, Mr. Valdes requested that the books and records of Banco de Mendoza be checked for the purpose of verifying that net quoted loans were received *119 from CINB and that withholding taxes imposed on net quoted loan interest payments were paid on behalf of CINB. CINB subsequently received a Borrower Letter from Banco de Mendoza dated August 8, 1988, directed to the attention of Ana Martelli. The pertinent portion of that letter reads as follows: In this matter, we understand that you have not received nor can you locate the withholding tax receipts, corresponding to the taxes withheld by Argentina, on the interest that was paid according to our loan agreements with you, for the years of 1977 and 1978. In accordance with the requirements of said agreements, we are responsible for the payment of withholding taxes on said interest. Accordingly, the attached chronogram, that we understand was prepared according to the books and records of CONTINENTAL BANK, has been verified by reference to the books and records of the Bank of Mendoza, and is a precise and complete list of all the interest payments and their respective withholdings of taxes, according to the aforementioned agreements. Through this means, we certify that all withholding taxes have been paid and that you have no responsibility for the same.
Ms. Antonucci and Mr. Lopez both *120 signed the Borrower Letter. Banco de Mendoza indirectly incorporated a schedule prepared by representatives of CINB and petitioner's counsel purportedly showing the amount of withholding tax that should have been paid on CINB's behalf, into the Borrower Letter by attaching such schedule thereto. Banco de Mendoza also utilized language similar, but not identical, to language utilized in one of the form letters prepared by petitioner's counsel and made available by Mr. Valdes. The total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to Banco de Mendoza both equal $ 24,209. Those total amounts include $ 1,263 for 1977 and $ 22,946 for 1978. Banco Quilmes
On that same trip to Argentina, Mr. Valdes met with representatives of Banco Quilmes. Mr. Valdes requested that tax receipts be provided for purposes of substantiating payments of withholding taxes by Banco Quilmes on behalf of CINB. After ascertaining that only one tax receipt could be provided, [24] Mr. Valdes requested that the books and records of Banco Quilmes be checked for the purpose of verifying that net quoted loans were received from CINB and that withholding *121 taxes imposed on net quoted loan interest payments were paid on behalf of CINB. CINB subsequently received a Borrower Letter from Banco Quilmes dated July 26, 1988, directed to the attention of Mr. Vlach. The pertinent portion of that letter reads as follows: We understand that you have not received or are unable to locate tax receipts for the ARGENTINE withholding taxes on interest paid to you under our loan *122 agreements with you relating to the years 1977 through 1979. As required under such agreements, we are responsible for paying the withholding taxes on such interest. Accordingly, the attached schedule, which we understand was prepared from the books and records of Continental Bank, has been verified by reference to the books and records of Banco Quilmes S.A. and is an accurate and complete listing of all interest paid and taxes withheld under such agreements. We hereby certify to you that all such taxes have been paid and that you shall have no liability for such taxes.
Pablo G. Martin and Hector Cesar Piere both signed the Borrower Letter. Banco Quilmes indirectly incorporated a schedule prepared by representatives of CINB and petitioner's counsel, purportedly showing the amount of withholding tax that should have been paid on CINB's behalf, into the Borrower Letter by attaching such schedule thereto. Mr. Martin and Mr. Piere both signed such schedule. Banco Quilmes also utilized language identical to language utilized in one of the form letters prepared by petitioner's counsel and made available by Mr. Valdes. The total amount of additional interest income and the total amount *123 of foreign tax credits remaining in issue with respect to Banco Quilmes both equal $ 8,632. Those total amounts include $ 3,238 for 1978 and $ 5,394 for 1979. Banco de la Provincia de Rio Negro
On that same trip to Argentina, Mr. Valdes met with Alfredo Ormeno and Carlos E. Peovich, the manager and submanager, respectively, in charge of Banco de la Provincia de Rio Negro's (Banco de la Provincia) books and records, including those pertaining to withholding taxes. Mr. Valdes requested that tax receipts be provided for purposes of substantiating payments of withholding taxes by Banco de la Provincia on behalf of CINB. After ascertaining that tax receipts were not available, Mr. Valdes requested that the books and records of Banco de la Provincia be checked for the purpose of verifying that net quoted loans were received from CINB and that withholding taxes imposed on net quoted loan interest payments were paid on behalf of CINB. CINB received a Borrower Letter from Banco de la Provincia dated July 20, 1988, directed to the attention of Mr. Vlach. The pertinent portion of that letter reads as follows: We understand that you have not received or are unable to locate tax receipts for *124 the ARGENTINA withholding taxes on interest paid to you under our loan agreements with you relating to the years 1977 through 1979. As required under such agreements, we are responsible for paying the withholding taxes on such interest. Accordingly, the attached schedule, which we understand was prepared from the books and records of Continental Bank, has been verified by reference to the books and records of BANCO DE LA PROVINCIA DE RIO NEGRO and is an accurate and complete listing of all interest paid and taxes withheld under such agreements. We certify to you that all such taxes have been paid and that you shall have no liability for such taxes.
Mr. Ormeno and Mr. Peovich both signed the Borrower Letter. Banco de la Provincia indirectly incorporated a schedule prepared by representatives of CINB and petitioner's counsel, purportedly showing the amount of withholding tax that should have been paid on CINB's behalf, into the Borrower Letter by attaching such schedule thereto. Mr. Ormeno and Mr. Peovich both signed such schedule. Banco de la Provincia also utilized language almost identical to language utilized in one of the form letters prepared by petitioner's counsel and made *125 available by Mr. Valdes. The total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to Banco de la Provincia both equal $ 32,829. [25] Those total amounts include $ 471 for 1977, $ 6,521 for 1978, and $ 25,837 for 1979. Venezuela
Oficina Central de Asesoria y Ayuda Tecnica, C.A.
On a trip to Venezuela early in December 1988, Mr. Valdes met with Ricardo Mata, finance manager of Oficina Central de Asesoria y Ayuda Tecnica, C.A. (Oficina Central), a company which distributes Pepsi products in Venezuela. After advising Mr. Valdes that tax receipts were not available, [26] *126 Mr. Mata indicated that he could provide a written certification regarding the payment of withholding taxes by Oficina Central on CINB's behalf. CINB subsequently received a Borrower Letter from Oficina Central dated December 19, 1988. That letter reads as follows: I, Ricardo Mata F., Finance Manager, of Oficina Central de Asesoria y Ayuda Tecnica, C.A., (O.C.A.A.T., C.A.), do hereby certify that the following schedule accurately reflects the amounts shown in the books and records maintained by Oficina Central de Asesoria y Ayuda Tecnica, C.A., (O.C.A.A.T., C.A.) with respect to loans debts *127 to Continental Illinois National Bank and Trust Company.
INTEREST
NET
TAXES
GROSS
PERIOD
INTEREST PAID
WITHHELD
INTEREST PAID
1979
$ 26,173.13
4,619.56
30,792.69
Mr. Mata signed the Borrower Letter. The total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to Oficina Central both equal $ 4,620. The Philippines
Philippine National Bank
Prior to Mr. Yeager's arrival in the Philippines, Judith A. Thompson, a vice president and general manager at CINB's Hong Kong branch, sent a letter dated June 17, 1988, to the Philippine National Bank (PNB) requesting assistance in verifying that withholding tax payments had been made on CINB's behalf in connection with certain net quoted loans. After stating that such verification was required by the Internal Revenue Service, Ms. Thompson's letter provided in pertinent part that: We realize that the loans and interest/withholding tax payments in question took place over 10 years ago and it is unlikely that the withholding tax receipts are still in your possession. However, the IRS has accepted from other of our Borrowers a statement certifying that withholding taxes have been paid in connection with *128 a schedule of interest payments. Enclosed is a schedule from our records of interest periods, interest payments and taxes withheld in conjunction with loans made by Continental Bank to Philippine National Bank during the period of 1977 to 1978 which has been certified as authentic. The certification is enclosed as well. Also enclosed is a sample letter to Continental Bank which would be sufficient evidence to the IRS that Philippine National Bank has paid withholding taxes in the Philippines in relationship to loans/interest payments involved. Continental Bank would appreciate it that if you are unable to provide an actual copy of relevant withholding tax receipts, you would prepare and sign the attached letter on your own letterhead. This would sufficiently support our case to the IRS.
The letter concluded with a paragraph regarding the timing and purpose of the trip Mr. Yeager planned to take to the Philippines to meet with representatives of PNB. The particular form letter, which was attached to the letter dated June 17, 1988, together with a schedule prepared by representatives of CINB and petitioner's counsel and a certification pertaining to the accuracy of such schedule, *129 reads as follows: We understand that you have not received or are unable to locate tax receipts for Philippine withholding taxes on fees, commissions, and other charges paid to you under our loan agreements with you relating to the years 1977 to 1978. As required under such agreements, we are responsible for paying the withholding taxes on such fees, commissions, and charges. Accordingly, the attached schedule is an accurate and complete listing of all fees, commissions, and charges paid and taxes withheld under such agreements. The attached schedule is based upon entries made under my supervision in the books and records of Philippine National Bank (PNB); the schedule was made by an employee of PNB with knowledge of the fees, commissions, and charges paid and the taxes withheld, at or about the time of the payment of the withholding taxes, in the course of regularly conducted business activity pursuant to regular business practices and procedures. We hereby certify to you that all such taxes have been paid and that you shall have no liability for such taxes.
On June 30, 1988, Mr. Yeager met with R. M. De Guzman, a vice president in PNB's International Department. Mr. Yeager informed *130 Mr. De Guzman about the pending litigation and inquired into the possibility of obtaining tax receipts. After ascertaining that neither tax receipts [27] nor the relevant portions of PNB's books and records were available, Mr. Yeager requested that Mr. De Guzman provide some sort of a statement pertaining to PNB's custom and practice regarding payment of withholding taxes. Mr. De Guzman provided Mr. Yeager with a Borrower Letter dated June 30, 1988, *131 directed to his attention and typed while he waited, which reads as follows: We understand that you have not received or are unable to locate tax receipts for the Philippine withholding taxes on interest paid to you relating to the years 1977 through 1978. As required under your terms on the lending, we are responsible for paying the withholding taxes on such interest. Accordingly, the attached schedule, which we understand was prepared from the books and records of Continental Bank, is a listing of the interest paid and taxes withheld. In accordance with the provisions of revenue laws in the Philippines, it is and was the custom and practice of PNB to withhold taxes on interest expense paid and to remit to the Bureau of Internal Revenue of the Philippines such amounts.
Mr. De Guzman signed the Borrower Letter. Mr. De Guzman incorporated the schedule prepared by representatives of CINB and petitioner's counsel, purportedly showing the amount of withholding tax that should have been paid on CINB's behalf, into the Borrower Letter by having such schedule retyped on PNB letterhead and attached thereto. In drafting the Borrower Letter, Mr. De Guzman did not utilize the particular form *132 letter, which was prepared by petitioner's counsel and attached to the letter to PNB dated June 17, 1988. Instead, Mr. De Guzman utilized some language in the first paragraph of the Borrower Letter similar, but not identical, to language utilized in a different form letter prepared by petitioner's counsel and made available by Mr. Yeager. The language used in the second paragraph did not originate in any of the form letters prepared by petitioner's counsel. The total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to PNB both equal $ 13,153. Those total amounts include $ 6,753 for 1977 and $ 6,400 for 1978. Thailand
First Bangkok City Bank
Prior to Mr. Yeager's arrival in Thailand, Boey Sek Onn, second vice president at CINB's Singapore branch, made a telefax transmission to First Bangkok City Bank on June 17, 1988, requesting assistance in locating tax receipts or other records reflecting payment of withholding tax on interest paid to CINB for the years 1977 through 1979. Attached to the telefax was a schedule purportedly showing for the period in question the amount of interest payments made to CINB and the amount *133 of withholding tax that should have been paid on CINB's behalf by First Bangkok City Bank. Mr. Onn made another telefax transmission on June 23, 1988, inquiring about whether First Bangkok City Bank had "located the withholding tax receipts or other records pertaining to either the net interest paid to Continental Bank or the withholding tax paid during the years mentioned in our earlier correspondence." [28] That telefax further provided in pertinent part that: We have earlier given you schedules of interest and withholding tax prepared from our records. These were certified and sworn by authorized personnel of Continental Bank in the presence of a notary public. This certification can be presented to you when we meet * * *. Where the withholding tax receipts cannot be located or where it is apparent from the records (whether yours or ours, as shown in the schedule given to you) that more withholding tax was paid than could be supported by withholding tax receipts (whether original or copies) in hand, you may wish to consider certifying the schedules in the following suggested manner: "We understand that you have not received or are unable to locate tax receipts for the Thai withholding *134 taxes on interest paid to you under our loan agreements with you relating to the years 1977 through 1979. As required under such agreements, we are responsible for paying the withholding taxes on such interest. Accordingly, the attached schedule is an accurate and complete listing of all interest paid and taxes withheld under such agreements. The attached schedule is based upon entries made under my supervision in the books and records of First Bangkok City Bank which were made by an employee of First Bangkok City Bank with knowledge of the interest paid and the taxes withheld, at or about the time of the payment of the withholding taxes, in the course of regularly conducted business activity pursuant to regular business practices and procedures. We hereby certify to you that all such taxes have been paid and that you shall have no liability for such taxes." That telefax concluded *135 with a paragraph alluding to the trip Mr. Yeager planned to take to Thailand to meet with representatives of First Bangkok City Bank. On July 15, 1988, Mr. Yeager met with Samart Suchintabandid, vice president and general manager of First Bangkok City Bank's International Department. Mr. Suchintabandid informed Mr. Yeager that neither tax receipts nor a written certification along the lines suggested in the telefax dated June 23, 1988, could be provided by First Bangkok City Bank. However, Mr. Suchintabandid expressed a willingness on the part of First Bangkok City Bank to provide CINB with a letter stating generally that withholding taxes were paid. Mr. Yeager provided Mr. Suchintabandid with a form letter which petitioner's counsel prepared as a guide for borrowers certifying that withholding taxes were paid without referring in such certification to a specific schedule of interest payments and without attaching such a schedule thereto. First Bangkok City Bank provided CINB with a Borrower Letter dated July 15, 1988, directed to the attention of Mr. Yeager, which reads as follows: We understand that you have not received or are unable to locate tax receipts for Thailand withholding *136 taxes on interest paid to you under our funding arrangements with you relating to the years 1977 through 1978. As arranged, we are responsible for paying the withholding taxes on such interest. We hereby certify to you that all such taxes have been paid and that you shall have no liability for such taxes.
Mr. Suchintabandid signed the Borrower Letter. First Bangkok City Bank indirectly incorporated a schedule prepared by representatives of CINB and petitioner's counsel, purportedly showing the amount of withholding tax that should have been paid on CINB's behalf, into the Borrower Letter by attaching such schedule thereto. The representatives of CINB and petitioner's counsel erred in the preparation of such schedule by making gross-up adjustments, not required under the laws of Thailand, prior to calculating the amount of "Taxes Withheld." [29] *137 First Bangkok City Bank also utilized language similar, but not identical, to language utilized in the form letter prepared by petitioner's counsel and made available to Mr. Suchintabandid by Mr. Yeager. The total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to First Bangkok City Bank both equal $ 27,265. [30] Those total amounts include $ 3,852 for 1977 and $ 23,413 for 1978. Thai Farmers Bank
Prior to Mr. Yeager's arrival in Thailand, Mr. Onn made a telefax transmission to Thai Farmers Bank on June 17, 1988, requesting assistance in locating tax receipts or other records reflecting payment of withholding tax on interest paid to CINB for the years 1977 through 1979. Attached to the telefax was a schedule purportedly showing for the period in question the amount of interest payments made to CINB and the amount of withholding tax that should have been paid on CINB's behalf by Thai Farmers Bank. Mr. Onn made another telefax transmission on June 23, 1988, inquiring about whether Thai Farmers Bank had "located the withholding tax receipts or other records pertaining to either the net interest paid to Continental *138 Bank or the withholding tax paid during the years mentioned in our earlier correspondence." That telefax further provided in pertinent part that: We have earlier given you schedules of interest and withholding tax prepared from our records. These were certified and sworn by authorized personnel of Continental Bank in the presence of a notary public. This certification can be presented to you when we meet * * *. Where the withholding tax receipts cannot be located or where it is apparent from the records (whether yours or ours, as shown in the schedule given to you) that more withholding tax was paid than could be supported by withholding tax receipts (whether original or copies) in hand, you may wish to consider certifying the schedules in the following suggested manner: "We understand that you have not received or are unable to locate tax receipts for the Thai withholding taxes on interest paid to you under our loan agreements with you relating to the years 1977 through 1979. As required under such agreements, we are responsible for paying the withholding taxes on such interest. Accordingly, the attached schedule is an accurate and complete listing of all interest paid and taxes *139 withheld under such agreements. The attached schedule is based upon entries made under my supervision in the books and records of Thai Farmers Bank Ltd, which were made by an employee of Thai Farmers Bank Ltd with knowledge of the interest paid and the taxes withheld, at or about the time of the payment of the withholding taxes, in the course of regularly conducted business activity pursuant to regular business practices and procedures. We hereby certify to you that all such taxes have been paid and that you shall have no liability for such taxes."
That telefax concluded with a paragraph alluding to the trip Mr. Yeager planned to take to Thailand to meet with representatives of Thai Farmers Bank. Mr. Yeager subsequently met with Dharin Divari, first vice president in Thai Farmers Bank's International Department, and Mr. Amporn and Ms. Chomsuda, two other representatives of that bank. Mr. Yeager was informed that neither tax receipts nor a written certification along the lines suggested in the telefax dated June 23, 1988, could be provided by Thai Farmers Bank. Mr. Yeager was also informed that a decree authorizing a withholding tax exemption had been issued in 1979 and, therefore, *140 that any documentation regarding the payment of withholding taxes by Thai Farmers Bank on CINB's behalf would be limited to 1977 and 1978. Mr. Divari expressed a willingness on the part of Thai Farmers Bank to provide CINB with some sort of written certification subject to the approval of his superiors. Mr. Divari provided CINB with a Borrower Letter dated July 14, 1988, which reads as follows: We understand that you have not received or are unable to locate tax receipts for the Thailand withholding taxes on interest paid to you relating to the years 1977 through 1978. As required under the terms of the lending, we are responsible for paying the withholding taxes on such interest. Accordingly, the attached schedule, which we understand was prepared from the books and records of Continental Bank, is a listing of the interest paid and taxes withheld. We hereby certify to you that all such taxes have been paid.
Mr. Divari signed the Borrower Letter, which was delivered to Mr. Yeager at the hotel where he was staying while meeting with borrowers in Bangkok. Mr. Divari incorporated the schedule prepared by representatives of CINB and petitioner's counsel, purportedly showing the amount *141 of withholding tax that should have been paid on CINB's behalf for 1977 and 1978, [31] into the Borrower Letter by having such schedule retyped on Thai Farmers Bank letterhead and attached thereto. The representatives of CINB and petitioner's counsel erred in the preparation of such schedule by making gross-up adjustments, not required under the laws of Thailand, prior to calculating the amount of "Taxes Withheld." The total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to Thai Farmers Bank both equal $ 16,146. Those total amounts include $ 9,113 for 1977, $ 4,096 for 1978, and $ 2,937 for 1979. [32] *142 Laem Thong Bank
Prior to Mr. Yeager's arrival in Thailand, Mr. Onn made a telex transmission to Laem Thong Bank on June 14, 1988, requesting assistance in locating tax receipts or other records reflecting payment of withholding tax on interest paid to CINB for years 1969 through 1973 and the years 1977 through 1979. Attached to the telex was a schedule purportedly showing for the years 1969 through 1973 the amount of interest payments made to CINB and the amount of withholding tax that should have been paid on CINB's behalf by Laem Thong Bank. Mr. Onn made a telex transmission of a similar schedule for the years 1977 through 1979 to Laem Thong Bank on June 17, 1988. On July 14, 1988, Mr. Yeager met with Mr. Vichitr, deputy manager of Laem Thong Bank's Foreign Department, and another representative of that bank who attended the meeting to assist Mr. Vichitr in the event he encountered difficulty conducting the meeting in English. After Mr. Yeager explained the reason for such meeting (i.e., to request the bank's assistance in documenting foreign tax credits claimed by CINB), Mr. Vichitr informed Mr. Yeager that the loans in question appeared *143 to be trade-related financing with respect to which no withholding taxes would have been imposed. Mr. Vichitr also informed Mr. Yeager that Laem Thong Bank had never paid any withholding tax on behalf of CINB. Finally, Mr. Vichitr informed Mr. Yeager that a Borrower Letter to that effect could not be signed that day because Laem Thong Bank's board of directors needed to approve any such letter. CINB received a Borrower Letter dated July 18, 1988, which reads as follows: We have reviewed the attached schedules you provided from your books and records. We are unable to substantiate the amounts from Laem Thong Bank's records. It is our presumption because of the small amounts of interest that the transactions would probably have been trade related financing and therefore are not subjected to Thailand withholding taxes.
Thavee Chansrichawla, manager of Laem Thong Bank's Foreign Department, signed the Borrower Letter. Laem Thong Bank indirectly incorporated a schedule prepared by representatives of CINB and petitioner's counsel, purportedly showing the amount of withholding tax that should have been paid on CINB's behalf for 1977 through 1979, into the Borrower Letter by attaching such *144 schedule thereto. The representatives of CINB and petitioner's counsel erred in the preparation of such schedule by making gross-up adjustments, not required under the laws of Thailand, prior to calculating the amount of "Taxes Withheld." The total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to Laem Thong Bank both equal $ 2,614. Those total amounts include $ 1,421 for 1977 and $ 1,193 for 1978. Mexico
Federal Income Tax System
Imposition and Collection of Tax
Article 73 of the Constitution of Mexico authorizes the Federal Congress to impose taxes as necessary to cover the Federal budget. The Federal Revenue Law, which is issued annually by the Federal Congress for a period commencing on January 1 and ending on December 31, establishes the sources of income for the Federal Government. The Federal Income Tax Law, which is a special tax law enacted by the Federal Congress, regulates the sources of income established by the Federal Revenue Law. Article 3 of the Federal Income Tax Law provides that foreigners residing abroad are subject to income tax on income sourced in Mexico. Article 3 of the Federal Income Tax *145 Law further provides that revenues obtained from a Mexican resident are deemed to be sourced in Mexico. Article 31 of the Federal Income Tax Law imposes a tax on interest remitted abroad. The tax on interest becomes due when the obligation to pay such interest becomes enforceable, not when payment is actually made by the debtor. Article 2190 of the Civil Code provides that a debt becomes enforceable when the debtor cannot lawfully refuse payment thereof. Article 41 of the Federal Income Tax Law provided the applicable rates of tax imposed under article 31 of the Federal Income Tax Law. Article 41 of the Federal Income Tax Law also provided that a Mexican resident making interest payments to a nonresident lender was obligated to withhold the tax imposed under article 31 of the Federal Income Tax Law from such interest payments and to pay the withheld tax to the Mexican tax authorities. Regardless of any failure to withhold at the source, payments of withholding taxes were due on or before the 15th day of the month following the date on which the payment of interest was enforceable, or, if the 15th day of the month was not a business day, the next business day following the 15th *146 day of such month. Article 7 of the Federal Income Tax Law and article 96 of the Federal Tax Code establish a legal obligation upon borrowers required to pay withholding taxes to file the approved form of withholding tax return when making such payments. The form officially approved for purposes of paying withholding taxes on interest due to nonresident lenders is Form HISR 3. [33] A borrower is not required to file a separate HISR 3 for withholding tax payments made on behalf of different lenders; rather, all lenders on whose behalf the borrower is paying withholding taxes can be listed on the back side of the form. The tax authorities must provide the borrower with a stamped copy of Form HISR 3 as a receipt reflecting payment of withholding taxes. In some instances, the tax authorities provide "official receipts" (Recibo Official) reflecting payments of withholding taxes. Pursuant to article 11 of the Federal Income Tax Law and article 14 of the Federal Tax Code those persons who have the obligation to withhold or collect taxes on behalf of third parties are jointly liable for such taxes. *147 Article 18 of the Federal Tax Code authorizes the tax collecting authority to collect unpaid withholding taxes from the taxpayer upon whose income such taxes are imposed. The Federal Tax Code provides a 5-year statute of limitations on the collection of unpaid taxes and a 5-year record retention requirement exists for records pertaining to payment of taxes and compliance with other fiscal obligations. Deductibility of Interest Payments
The Mexican income tax on interest due to nonresident lenders is imposed on gross interest income derived from sources in Mexico. All interest paid by a resident of Mexico is deductible for purposes of determining such resident's taxable income. Interest includes the amount of withholding taxes on interest payments which a borrower agrees to absorb on behalf of the lender. [34] In order for a Mexican borrower to deduct interest paid to a nonresident lender, article 26 of the Federal Income Tax Law requires, inter alia, that the borrower comply with the obligation to withhold tax on such interest and pay the withheld tax to the Mexican tax authorities, or demand proof from the lender that the tax has been paid. In case of audit, a Mexican borrower *148 must establish compliance with the legal requirements for the deduction of interest, including proof of payment of withholding taxes imposed on such interest. Statutory Exemptions From Tax
During the years in issue, article 5 of the Federal Income Tax Law exempted from income tax all public service enterprises belonging to the Mexican Federal Government, to the government of the Federal District, or to the government of any Mexican *149 state or municipality. Such enterprises include, among others, PeMex and CFE. Enterprises exempt from income tax under article 5 of the Federal Income Tax Law remained obligated to withhold tax imposed on payments to third parties, to pay withheld tax to the Mexican tax authorities, and to comply with applicable filing requirements. Article 16 of the Mexican Federal Tax Code exempted the Mexican Federal Government from income tax. Prior to 1981, no statutory exemption existed with respect to withholding taxes imposed on interest due to nonresident lenders. In 1981, the Mexican Congress recodified the Federal Income Tax Law. Article 144 of the Federal Income Tax Law of 1981 recodified the provisions of article 31 of the Federal Income Tax Law, which imposes a tax on interest due to nonresident lenders. Article 154 of the Federal Income Tax Law of 1981 recodified the provisions of article 41 of the Federal Income Tax Law, regarding the applicable rates of tax imposed under article 31 of the Federal Income Tax Law and certain withholding tax obligations. Article 154 of the Federal Income Tax Law of 1981 also provided what at the time was the sole statutory exemption from imposition *150 of withholding tax on interest due to nonresident lenders. That exemption only applied with respect to interest which was derived from credit granted to the Mexican Federal Government. In 1982, the Federal Congress enacted article 154-A, which provided four statutory exemptions from the imposition of withholding tax on interest due to nonresident lenders, including the exemption previously provided under article 154 of the Federal Income Tax Law of 1981. The Federal District Tax
The Federal District, which consists of the area comprising Mexico City, and the 31 states of Mexico each has its own revenue laws. During the years in issue, the Federal District imposed a tax on interest income. [35] Under article 320 of the Tax on Proceeds of Capital, the recipient of the interest income was liable for such tax. Articles 316 and 317 of the Tax on Proceeds of Capital extended liability for such tax to lenders not residing in the Federal District or Mexico, i.e., nonresident lenders. Article 318 of the Tax on Proceeds of *151 Capital provided for tax to be imposed on gross interest at the rate of 5 percent. Article 931 provided for an additional tax of 15 percent of the tax due on the gross interest. Thus, tax was imposed by the Federal District at a combined rate of 5.75 percent. Article 325 of the Tax on Proceeds of Capital provided that, if the lender was a foreign bank without branches or representatives in the Federal District, the borrower was required to withhold tax and pay the withheld tax to the Treasury of the Federal District. Article 325 further provided that the borower must file an officially approved form and pay withholding taxes within the first 15 days of January, April, July, and October of each year. Article 322 of the Tax on Proceeds of Capital exempted lenders from the Federal District Tax on interest income derived from authorized transactions with decentralized public agencies or agencies of State participation. Decentralized Agencies and Enterprises of State Participation
Under article 2 of the Law for the Control, by the Federal Government, of Decentralized Agencies and Enterprises of State Participation, a "decentralized agency" is a legal entity created by an act of the *152 Federal Congress or by Presidential decree. That law authorizes the creation of such agencies for the purpose of "rendering of public or social services, the exploitation of assets or resources of national property, engagement in scientific or technological research, or the obtainment and application of resources for purposes of public assistance or social security." The capital of a decentralized agency, which is not represented by shares of stock, is owned entirely by the Mexican Federal Government and may be made up "wholly or in part of Federal funds or assets or of funds or assets of other decentralized agencies, or of appropriations, subsidies, concessions or rights granted or contributed to them by the Federal Government, or of the yield of a specific tax." The General Business Company Law does not govern any aspect of a decentralized agency's activities. Although owned and controlled by the Mexican Federal Government, decentralized agencies maintain their own property and have a legal existence separate and apart from that of the Mexican Federal Government. Decentralized agencies can be sued before Federal courts and they have the same rights and obligations as any individual *153 to defend themselves and produce evidence in accordance with the Federal Code of Civil Procedure. Under article 3 of the Law for the Control, by the Federal Government, of Decentralized Agencies and Enterprises of State Participation, an "enterprise of State participation" is a legal entity created by its shareholders or partners by means of a charter recorded in the Public Registry of Commerce, which meets any of the following requisites: (1) The Mexican Federal Government owns at least 50 percent of the capital stock or of the shares of such enterprise; (2) the composition of the capital stock includes shares of a special series to which only the Mexican Federal Government may subscribe; or (3) the Mexican Federal Government is empowered to designate the majority of the members of the board of directors, directing body or equivalent agency, or to designate the president or director or the manager, or is empowered to veto resolutions of a general meeting of shareholders, or of a meeting of the board of directors, or of the equivalent directing body or agency. Private individuals or entities may own that portion of the capital stock or shares of an agency of State participation which *154 is not owned by the Mexican Federal Government. The General Business Company Law governs the organization, operation, dissolution, and liquidation of an enterprise of State participation. Under the General Public Debt Law, the public debt of Mexico consists of direct and contingent liabilities arising from loans payable by: (1) The Federal executive branch and its dependent agencies; (2) the Department of the Federal District; (3) decentralized agencies; (4) companies having a majority of State participation; (5) national auxiliary credit institutions and organizations, national insurance and bonding companies; and (6) any trusts where the Mexican Federal Government is the grantor. CINB's Lending Activity inMexico
CINB operated in Mexico through a representative office located in Mexico City, which was opened in 1962 to create a presence for CINB in Mexico. Employees assigned to the representative office solicited new business for CINB and acted as a conduit for communications between Mexican borrowers and CINB. The representative office was not authorized to accept deposits or make loans. CINB's borrowers in Mexico fell into three general categories: (1) Correspondent banks *155 with which CINB had dealt for many years; (2) the Mexican Government and public sector entities controlled by the Mexican Government; and (3) private sector companies (e.g., domestic Mexican corporations and Mexican subsidiaries of multinational corporations). CINB took a conservative approach to lending in Mexico. Approximately 90 percent of the loans CINB made in Mexico in the 1970's were to large banks and public sector entities. CINB competed with many other major banks that also sought to loan money to Mexican borrowers. The intensity of the competition between banks kept the spreads (i.e., the difference between a bank's cost of funds and the interest rate charged to borrowers) on loans to Mexican borrowers relatively low. Most of the loans extended to Mexican borrowers, including those made by CINB, were net quoted loans. PeMex
Organization and Operation
PeMex was created by Presidential decree on June 7, 1938, as a public institution. Pursuant to article 27 of the Mexican Constitution, all oil and gas in Mexico belongs to the nation. Article 4 of the Regulating Law of article 27 of the Mexican Constitution provides that the nation will carry out the exploration and exploitation *156 of its oil and gas through PeMex. On February 6, 1971, the Mexican Congress enacted the Organic Law for PeMex. Under article 1 of the Organic Law, PeMex was established as a technical, industrial, and business "decentralized public agency" of the Mexican Federal Government. After approval by the board of directors of PeMex, the annual operating plans must be filed with the Ministry of Energy, Mines and Parastate Industry. Similarly, the annual operating plans, investment programs, and revenue and disbursement budgets approved by the board of directors of PeMex must be submitted to the Ministry of Finance and Public Credit for further approval. Under the applicable special tax regime, PeMex is a major provider of funds to the Mexican Federal Government. PeMex is also a major source of foreign exchange for the Mexican Federal Government. Special Tax Regime
Each December the Federal Congress enacts as part of the Federal Revenue Law provisions of a special tax regime applicable to PeMex for the following year. Under that special tax regime, PeMex pays taxes to the Mexican Federal Government on gross income derived from various activities. PeMex pays such taxes at rates which are *157 adjusted annually and specified in article 6 of the Federal Revenue Law. During the years in issue those rates ranged from 12 percent to 18 percent depending upon the year and the nature of the income-generating activity. Those tax rates resulted from budget negotiations between PeMex and the Mexican Federal Government which took into account estimates of income, expenses, and capital expenditures. During the years in issue, article 6 of the Federal Revenue Law required daily deductions of a specified amount from an account maintained by PeMex at the Banco de Mexico (the central bank of Mexico), which subsequently turned such payments over to the Federal Treasury, as provisional payment of certain taxes imposed under the special tax regime. For those years, article 6 of the Federal Revenue Law also required PeMex to report its gross income for the preceding year by March 15 of the following year so that the Ministry of Finance and Public Credit could determine the sufficiency of the provisional payments. Finally, article 6 of the Federal Revenue Law required that amounts remaining after payment of taxes under the special tax regime were to be invested by PeMex in securities indicated *158 and authorized by the Ministries of Finance and Public Credit and of Programming and Budget. [36]
The Federal Revenue Law applicable during each of the years in issue specified that, except for the special tax regime, PeMex was subject to all other obligations imposed by Mexican tax laws, including the obligation to pay withholding taxes on behalf of third parties. Article 6 of the Federal Revenue Law of 1979 provides in pertinent part that: VII. Legal Regime - The legal precepts which regulate the collection of the taxes to which [article 1] of this law refers, shall continue in effect, with the exception of the dispositions of this precept, however, the Ministry of Finance and Public Credit may dispense Petroleos Mexicanos from the compliance with the requirements and obligations of control when the Ministry considers it necessary. Likewise, Petroleos Mexicanos must continue meeting its obligation of withholding fiscal credit on behalf of third parties, in the manner established in the fiscal laws.
Neither article 6 of *159 the Federal Revenue Law of 1977 nor article 6 of the Federal Revenue Law of 1978 contains language corresponding to the language set forth in the second paragraph quoted above. However, as applicable during both of those years, article 6 of the Federal Revenue Law included a paragraph either identical, or almost identical, to the first paragraph quoted above. PeMex pays a substantial part of its gross income to the Mexican Federal Government pursuant to the special tax regime. As a percentage of PeMex's net income, the amount of tax imposed under the special tax regime approaches or exceeds 95 percent annually. Net Loan Study and Subsequent Documentation Efforts
During the net loan study, CINB attempted to determine the amount of the gross-up which should have been included in interest income and the amount of foreign tax credits which should have been claimed with respect to loans made to PeMex. Gustavo Rangel, an assessor in PeMex's Finance Administration Department, wrote a letter dated March 29, 1979, directed to the attention of Stanley Z. Finer, a loan officer working out of CINB's office in Mexico City during the years in issue, which stated in pertinent part: "we confirm *160 that all the taxes that said operation could cause in Mexico, will be on the account of Petroleos Mexicanos." Mr. Finer wrote a letter dated May 18, 1979, to Alberto J. Yarza C., an assistant manager in PeMex's Finance Administration Department, in which a request for documentation regarding the discharge of CINB's withholding tax obligation was made as follows: I realize that asking you to provide tax receipts or other evidence for the many transactions we did together over so long a period of time [172 interest payments made between January 24, 1968, and December 28, 1978], represents a severe administrative burden. If those tax receipts are not readily available, we will accept a statement from PEMEX confirming that it did indeed pay the required withholding tax, on our behalf, applicable to the interest paid to us during the above periods. Obviously, if PEMEX was not responsible for payment of such taxes during these periods, a statement to that effect will suffice.
Mr. Yarza responded by letter dated June 8, 1979, advising Mr. Finer that: By means of the present letter, and regarding your attentive letter dated May 18 of the present year, it pleases us to make evident that Petroleos *161 Mexicanos is a Decentralized Public Entity of the Federal Government; that is subject to a special system of taxation and that, in accordance therefore, has satisfactorily covered all the obligations that are derived from it.
Mr. Yarza directed another letter dated June 11, 1979, to Mr. Finer, which read as follows: By means of the present letter and regarding your attentive letter of May 18 of the present year, it pleases us to make evident Petroleos Mexicanos has assumed the responsibility of payment of taxes of its financing during the period which you mentioned in your communication.
Mr. Finer directed an interoffice memorandum dated July 6, 1979, to Erik C. Jurgensen, an account officer in CINB's International Banking Department, which read in pertinent part as follows: This memo will serve as a follow-up to the letters which we received from various clients regarding the fulfillment of their withholding tax obligations. I have had additional conversations with each of the following names to determine whether we have, in fact, received the maximum evidence available from each of these institutions. The results are as follows: * * * PETROLEOS MEXICANOS (PEMEX)
Alberto Yarza, Subgerente *162 de Financiamientos, has confirmed to me that PEMEX does not give any lender anything more than was given us. They do not provide any lender with tax receipts under any circumstances.
On two occasions, CINB obtained legal opinions from the law firm of Santamarina y Steta, CINB's Mexican counsel, regarding the obligations of certain borrowers, including PeMex, to withhold and pay Mexican taxes. In the opinion letter dated June 8, 1979, CINB's Mexican counsel stated that neither PeMex nor the other borrowers listed in such letter were exempt from joint liability for payment of withholding taxes on interest paid to nonresident lenders. CINB's Mexican counsel further stated in such letter that: I confirm to you that said borrowers were legally obliged to pay taxes on behalf of Continental Illinois National Bank and Trust Company of Chicago during each interest payment period, and considering their joint liability, they should have done such payments presumably, in due time.
The opinion letter dated January 28, 1981, which pertained specifically to the special tax regime applicable to PeMex, stated in pertinent part that: Pemex is liable for the withholding of the Income Tax applicable to *163 interest deriving from foreign loan transaction, and may only be expressly exempt by the Ministry of Finance and Public Credit.
CINB received a letter dated December 3, 1982, from PeMex which provided in pertinent part as follows: In general, Pemex meets its own tax obligations under Mexican Law by making tax payments (based primarily on its gross receipts) to the Mexican Government; taxes which would otherwise be imposed upon a Mexican company are not paid by Pemex as such. Under the method of taxation which has been applicable to Pemex for the last 18 years, Pemex has not been required to withhold or pay any Mexican income, sales or other taxes, including the withholding of such taxes, on loans and rentals paid to Nonresidents of Mexico, otherwise applicable. Regarding the future, so long as Pemex's method of taxation continues, no withholding of income, sales or other taxes will be required on loans and rental payments by Pemex to Nonresidents of Mexico.
Such letter, which was signed by Santiago de Leon Trevino, a manager in PeMex's Finance Administration Department, made specific reference to withholding taxes imposed on interest accruals or payments made during the 5-year period *164 from January 1, 1969, to December 31, 1973. PeMex originally drafted letters with language similar to the language used in the December 3, 1982, letter for the purpose of documenting certain tax aspects of leasing transactions. On March 22, 1987, Messrs. Valdes and Vlach traveled to Mexico City to meet with borrowers of CINB, including PeMex. [37] Messrs. Valdes and Vlach met with Carlos Diaz, PeMex's deputy manager of financing, and his superior, Rafael Bracho. When Mr. Valdes requested that PeMex provide tax receipts to CINB he was informed that PeMex had a policy against providing foreign lenders with tax receipts. Mr. Valdes showed Mr. Diaz the letter from PeMex dated March 29, 1979, and the letter from PeMex dated December 3, 1982. Mr. Valdes asked Mr. Diaz to confirm whether or not PeMex was liable for withholding tax imposed on interest payments to CINB and, if so, whether or not such taxes were paid. Mr. Diaz indicated that PeMex was liable for withholding taxes and, therefore, that there must have been a mistake in the letter dated December 3, 1982. Mr. Diaz also indicated that PeMex would provide CINB with a revised letter regarding the withholding taxes in question. *165 Mr. Valdes provided Mr. Diaz with a schedule prepared by representatives of CINB and petitioner's counsel, which purportedly showed the amount of withholding tax that should have been paid on CINB's behalf with respect to net quoted loans. Mr. Valdes also made available to Mr. Diaz a form letter prepared by petitioner's counsel as a guide for borrowers providing written certifications which refer specifically to the schedule prepared *166 by representatives of CINB and petitioner's counsel. PeMex subsequently provided CINB with a letter dated March 23, 1987, directed to the attention of Mr. Vlach, which reads as follows: We understand that you have not received or are unable to locate tax receipts for the Mexican withholding taxes on interest paid to you under our loan agreements with you relating to the years 1977 through 1979. As required under such agreements, we are responsible for paying the withholding taxes on such interest. We confirm that there is no money owing by Continental Bank to the Secretaria de Hacienda y Credito Publico on account of withholding taxes applicable to interest payments made by Petroleos Mexicanos according to article 154 of the Income Tax Law of Mexico.
Mr. Diaz signed the letter and attached the schedule prepared by representatives of CINB and petitioner's counsel thereto. The letter dated March 23, 1987, was the kind of letter which PeMex typically provided to lenders who requested written confirmation that no taxes were due in connection with loan transactions. Respondent refused to accept the letter dated March 23, 1987, as substantiation of payment of withholding taxes by PeMex *167 on CINB's behalf. Consequently, Mr. Valdes returned to Mexico City for further meetings with PeMex. Initially, Mr. Valdes attempted to convince PeMex to allow a representative to testify at the trial of this case. After being informed that a recently approved Mexican law prohibited the testimony of a PeMex representative in proceedings outside of Mexico regarding matters relating to the official duties of such representative, Mr. Valdes requested that PeMex provide CINB with a letter, if possible, specifically indicating that PeMex paid withholding taxes on CINB's behalf. PeMex subsequently provided CINB with a letter dated May 25, 1988, directed to the attention of Mr. Vlach, which reads as follows: We understand you have not received or are unable to locate tax receipts for the Mexican withholding taxes on interest paid to you under our loan agreements with you related to the years 1977 through 1979 as indicated on the attached schedule. As required under such loan agreements, we are responsible for paying the withholding taxes on such interest. We hereby certify to you that all such taxes have been paid and that you shall have no further liability for such taxes.
Mr. Diaz signed *168 the letter and attached the schedule prepared by representatives of CINB and petitioner's counsel thereto. By letter dated December 19, 1988, petitioner's counsel advised PeMex of the intention of respondent's counsel to request an opportunity to meet with Mr. Diaz to discuss withholding tax matters. By letter dated December 20, 1988, respondent's counsel requested an opportunity to meet with Mr. Diaz to discuss the possibility of obtaining information and documentation concerning the payment of withholding taxes by PeMex on CINB's behalf. The law firm of Cleary, Gottlieb, Steen and Hamilton, U.S. counsel for PeMex, subsequently advised respondent's counsel of its representation of PeMex in this matter. CINB received a letter from PeMex dated March 10, 1989, directed to the attention of Mr. Vlach, which reads as follows: We hereby withdraw our letter to you of May 25, 1988. In that regard, we are providing you with the following information. Petroleos Mexicanos ("Pemex") is a decentralized public agency, wholly owned by the United Mexican States. Under Mexican law applicable to Mexican borrowers, including Pemex, interest paid to nonresidents of Mexico is generally subject to Mexican *169 withholding tax. In general, Pemex meets its own tax obligations under Mexican law by making tax payments (based primarily on its gross receipts) to the Mexican Government; taxes which would otherwise be imposed upon a Mexican company are not paid by Pemex as such. Under the method of taxation which has been applicable to Pemex for over 25 years, Pemex has not been required to withhold or pay any Mexican federal or local income taxes, including the withholding of such taxes, on interest paid to nonresidents of Mexico. Furthermore, pursuant to the aforesaid method of taxation, nonresident Mexican recipients of interest from Pemex have not been requested to pay such taxes, assuming that the interest income has not otherwise been subject to Mexican taxes because of the nonresident's other activities in Mexico.
Mr. Diaz signed the letter. By facsimile transmission dated March 10, 1989, respondent's counsel received a copy of the letter from PeMex to CINB. When Mr. Valdes learned of the contents of the letter dated March 10, 1989, he was shocked and could not believe that PeMex sent a letter to CINB which was contrary to what he thought representatives of PeMex had told him in prior face-to-face *170 meetings. Mr. Valdes felt as though he had been lied to by those representatives of PeMex with whom he had met. Mr. Valdes subsequently arranged a meeting with Mr. Diaz and Mr. Bracho for the purpose of discussing the letter dated March 10, 1989. At such meeting, which took place in late March or early April 1989, discussions were held regarding whether or not PeMex was liable for withholding taxes imposed on interest payments to CINB and, if so, whether or not such taxes were paid. Messrs. Diaz and Bracho informed Mr. Valdes of the existence of an oral agreement between PeMex and the Mexican tax authorities which pertained to PeMex's obligation to pay withholding taxes imposed on interest paid to nonresident lenders. Neither Mr. Diaz nor Mr. Bracho could tell Mr. Valdes the identity of the officials who had entered into the oral agreement. Informal Administrative Understanding
In connection with his representation of PeMex, which dates back to 1979, Leslie B. Samuels, a partner in the law firm of Cleary, Gottlieb, Steen and Hamilton, had extensive discussions with representatives of PeMex, including Mr. Rangel and Santiago de Leone, regarding the system of taxation to which PeMex *171 was subject. Beginning in 1979, Mr. Samuels participated in drafting and reviewing documents addressing PeMex's withholding tax obligations in the context of various financing transactions in which PeMex was engaged at the time with nonresidents of Mexico. PeMex provided those documents to nonresidents of Mexico who sought to understand how PeMex's system of taxation affected such transactions. Specifically, certain financial institutions located in the United States, which were dealing with PeMex on a net payment basis, sought assurance that they would not be put in the position of being required for Federal income tax purposes to gross up income to reflect receipt of payments net-of-tax, while at the same time being denied any corresponding foreign tax credits. Early in 1979 Messrs. Rangel and de Leone advised Mr. Samuels of the existence of an informal administrative understanding (i.e., an oral agreement) which made payment of withholding taxes on behalf of nonresident lenders unnecessary. Mr. Samuels subsequently conducted an investigation into why PeMex did not pay such taxes in the manner prescribed by law. Because his investigation yielded no other explanation, Mr. Samuels *172 concluded that the special tax regime to which PeMex was subject encompassed the withholding tax obligation. Messrs. Rangel and de Leone subsequently advised Mr. Samuels that payments made by PeMex under the special tax regime did not encompass PeMex's obligation to pay withholding taxes. None of the other representatives of PeMex with whom Mr. Samuels discussed the informal administrative understanding indicated otherwise. Mr. Samuels neither drafted nor transmitted the letter dated May 25, 1988, or any letter similar in substance, in connection with his representation of PeMex. Mr. Samuels drafted the letter dated March 10, 1989, purportedly withdrawing the letter dated May 25, 1988, for the review and signature of Mr. Diaz. Mr. Diaz discussed the content of the letter with Mr. Samuels and signed the letter as drafted without making any changes. Pursuant to a facsimile transmission made on March 17, 1989, petitioner's counsel sent a draft letter dated March 15, 1989, to Mr. Samuels. CINB wanted PeMex to provide a letter patterned after the draft letter to clarify the letter dated March 10, 1989, insofar as such letter relates to withholding taxes on interest paid by Mexican *173 borrowers to nonresidents of Mexico. PeMex needed to supply the percentage of PeMex's net income paid to the Mexican Federal Government in the years 1977 through 1987 in order to complete the draft letter, which had been prepared for the signature of Mr. Diaz. PeMex did not subsequently provide CINB with a letter along the lines of the proposed draft letter. Pursuant to an informal administrative understanding between PeMex and the Mexican tax authorities, which has been in existence for over 25 years, PeMex has not been required by the Mexican Federal Government to pay withholding tax imposed on interest paid or due to a nonresident lender under the terms of a net quoted loan agreement. Amounts Remaining in Issue After Subsequent Documentation Efforts
For 1977, petitioner claimed on its return $ 1,785,700 of additional interest income and foreign tax credits. CINB calculated that amount of additional interest income and that amount of foreign tax credits by applying a withholding tax rate of 26.75 percent to the interest payments made by PeMex, as adjusted to reflect PeMex's assumption of the obligation to pay taxes on CINB's behalf. In the notice of deficiency, respondent disallowed *174 all of the foreign tax credits claimed by petitioner for lack of substantiation. During trial preparation, petitioner conceded that $ 485,987 of the foreign tax credits claimed for 1977 should be disallowed and that CINB's additional interest income should be reduced by an equal amount because the interest payments from PeMex were not subject to the Federal District Tax of 5.75 percent. Additional interest income and foreign tax credits both in the amount of $ 1,299,713 remain in issue for 1977. For 1978, petitioner claimed on its return $ 23,331 of foreign tax credits and additional interest income. CINB calculated that amount of additional interest income and that amount of foreign tax credits by applying a withholding tax rate of 26.75 percent to the interest payments made by PeMex, as adjusted to reflect PeMex's assumption of the obligation to pay taxes on CINB's behalf. In the notice of deficiency, respondent disallowed all of the foreign tax credits claimed by petitioner for lack of substantiation. During trial preparation, petitioner conceded that $ 6,349 of the foreign tax credits claimed for 1978 should be disallowed and that CINB's additional interest income should be *175 reduced by an equal amount because the interest payments from PeMex were not subject to the Federal District Tax of 5.75 percent. Additional interest income and foreign tax credits both in the amount of $ 16,982 remain in issue for 1978. For 1979, petitioner claimed on its return $ 412,284 of foreign tax credits and additional interest income. CINB calculated that amount of additional interest income and that amount of foreign tax credits by applying a withholding tax rate of 10 percent to the interest payments made by PeMex, without any gross-up adjustment. In the notice of deficiency, respondent disallowed all of the foreign tax credits claimed by petitioner for lack of substantiation. Additional interest income and foreign tax credits both in the amount of $ 412,284 remain in issue for 1979. In its Second Amendment to Petition, petitioner claims additional foreign tax credits and additional interest income in the amounts of $ 1,309,889 for 1978 and $ 771,845 for 1979. CINB calculated the additional amounts of interest income and foreign tax credits for those years by applying a withholding tax rate of 21 percent to interest payments made by PeMex, without any gross-up adjustment. *176 The total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to PeMex are as follows: 1977
$ 1,299,713
1978
1,326,871
1979
1,184,129
Total      $ 3,810,713
CFE
Organization and Operation
CFE was created by Presidential decree on January 11, 1949, as a decentralized agency of the Mexican Federal Government. The purpose of CFE is to render electrical service, including the import and export thereof, to the general public in Mexico. Mexican law reserves the task of providing electric service to CFE and certain enterprises of State participation such as Compania de Luz y Fuerza del Centro, the shares of which are owned by the Mexican Federal Government. Unlike PeMex, which was a major provider of funds to the Mexican Federal Government during the years in issue, CFE was a major user of funds from the Mexican Federal Government. Net Loan Study and Subsequent Documentation Efforts
During the net loan study, CINB attempted to determine the amount of the gross-up which should have ben included in interest income and the amount of foreign tax credits which should have been claimed with respect to loans made to CFE. Mr. Finer wrote a letter *177 dated May 18, 1979, to Enrique Vilar, general finance manager of CFE, in which a request for documentation regarding the discharge of CINB's withholding tax obligation was made as follows: I realize that asking you to provide tax receipts or other evidence for the many transactions we did together over so long a period of time [27 interest payments made between March 17, 1969, and October 30, 1973, and interest payments made between May 21, 1976, and November 21, 1978], represents a severe administrative burden. If those tax receipts are not readily available, we will accept a statement from CFE confirming that it did indeed pay the required withholding tax, on our behalf, applicable to the interest paid to us during the above periods.
Mr. Vilar responded by letter dated May 31, 1979, advising Mr. Finer that: Reference is made to your letter dated May 18, 1979 to the Comision Federal de Electricidad, regarding the tax laws on the financing made by your bank to C.F.E. To that respect, we communicate to you that the payments made as interest are and will be free of any Mexican tax, in accordance with the terms agreed upon in said credit contract.
The opinion letter dated June 8, 1979, *178 pertinent portions of which are quoted above, applied to CFE as well as PeMex and certain other borrowers listed in such letter. Likewise, the memorandum dated July 6, 1979, which Mr. Finer sent to Mr. Jurgensen, an account officer in CINB's International Banking Department, applied to CFE as well as PeMex and certain other borrowers listed in such memorandum. Specifically with respect to CFE, the memorandum provided that: COMISION FEDERAL DE ELECTRICIDAD (CFE)
Enrique Vilar, Gerente General de Finanzas, told me that CFE will not provide lenders with anything more than what was given to us when borrowings are taken on a "net" basis, i.e., taxes for account of the borrower.
Mr. Vilar sent to CINB via telex transmission a letter dated March 28, 1985, which pertained to a $ 15 million term loan agreement dated May 26, 1973. That letter reads as follows: We confirm that any and all interest payments are free and clear of any Mexican withholding tax, in accordance with respective loan agreement. As of today, we have not been requested by any taxing authority to pay taxes on any interest payments.
While in Mexico City in March 1987, Messrs. Valdes and Vlach met with Roberto Fabre Gerard *179 and other representatives of CFE. Mr. Valdes requested that CFE provide tax receipts to CINB. CFE subsequently provided CINB with a letter dated June 18, 1987, directed to the attention of Mr. Vlach, which reads as follows: Reference is made to your letter dated May 18, 1979 to the Comision Federal de Electricidad, regarding the tax laws on the financing made by your bank to C.F.E. To that respect, we communicate to you that the payments made as interest in 1977, 1978, and 1979 were free of any Mexican tax, in accordance with the terms agreed upon in said credit contract. In accordance with your wishes please find attached a photocopy of the financial statements of C.F.E. in the years '77, '78 and '79.
Mr. Vilar signed the letter. By letter dated December 19, 1988, petitioner's counsel advised CFE of the intention of respondent's counsel to request an opportunity to meet with Mr. Gerard to discuss withholding tax matters. By letter dated December 20, 1988, respondent requested an opportunity to meet with Mr. Vilar and Mr. Gerard to discuss the possibility of obtaining information and documentation concerning the payment of withholding taxes by CFE on CINB's behalf. CFE subsequently *180 agreed to the request of respondent's counsel and scheduled a meeting for January 12, 1989, in Mr. Vilar's office. Thereafter, CFE cancelled the scheduled meeting and requested that respondent's counsel contact Mr. Walker or Mr. Samuels of the law firm of Cleary, Gottlieb, Steen and Hamilton, U.S. counsel for CFE, in connection with the matters in question. Informal Administrative Understanding
Pursuant to an informal administrative understanding similar to the understanding which exists between PeMex and the Mexican tax authorities, CFE has not been required by the Mexican Federal Government to pay withholding tax imposed on interest paid or due to a nonresident lender under the terms of a net quoted loan agreement. Amounts Remaining in Issue After Subsequent Documentation Efforts
For 1978, petitioner claimed on its return $ 468,955 of foreign tax credits and additional interest income. CINB calculated that amount of additional interest income and that amount of foreign tax credits by applying a withholding tax rate of 26.75 percent to the interest payments made by CFE, as adjusted to reflect CFE's assumption of the obligation to pay taxes on CINB's behalf. In the notice of deficiency, *181 respondent disallowed all of the foreign tax credits claimed by petitioner for lack of substantiation. During trial preparation, petitioner conceded that $ 127,529 of the foreign tax credits claimed for 1978 should be disallowed and that CINB's additional interest income should be reduced by an equal amount because the interest payments from CFE were not subject to the Federal District Tax of 5.75 percent. Additional interest income and foreign tax credits both in the amount of $ 341,356 [38] remain in issue for 1978. For 1979, petitioner claimed on its return $ 143,876 of foreign tax credits and additional interest income. CINB calculated that amount of additional interest income and that amount of foreign tax credits by applying a withholding tax rate of 10 percent to the interest payments made by CFE, *182 without any gross-up adjustment. In the notice of deficiency, respondent disallowed all of the foreign tax credits claimed by petitioner for lack of substantiation. Additional interest income and foreign tax credits both in the amount of $ 143,876 remain in issue for 1979. In its Second Amendment to Petition, petitioner claims additional foreign tax credits and additional interest income in the amount of $ 274,656 for 1977 and $ 238,578 for 1979. CINB calculated that amount of additional interest income and that amount of foreign tax credits by applying a withholding tax rate of 21 percent to interest payments made by CFE, as adjusted to reflect CFE's assumption of the obligation to pay taxes on CINB's behalf. The total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to CFE are as follows: 1977
$ 274,656
1978
341,356
1979
382,454
Total      $ 998,466 OPINION Foreign Tax Credits
Petitioner asserts that it is entitled to the foreign tax credits at issue, since the record establishes the withholding of foreign income taxes imposed on interest received from foreign net loan borrowers. Petitioner argues that under U.S. tax principles, *183 a taxpayer's entitlement to foreign tax credits for withholding taxes is determined by the withholding of such taxes. According to petitioner, this Court, in Lederman v. Commissioner, 6 T.C. 991 (1946), held that the act of withholding, not the act of payment, determines a taxpayer's eligibility for foreign tax credits with respect to foreign withholding taxes. Petitioner maintains that the principle of Lederman is wholly consistent with U.S. tax principles and with respondent's foreign tax credit regulations and rulings. According to petitioner, gross quoted loans and net quoted loans are alternative pricing mechanisms which always have an identical effect on U.S. lenders and foreign borrowers. Petitioner maintains that the foreign withholding taxes are withheld from interest payable to a lender under both a net and a gross loan. Finally, petitioner maintains that the foreign tax credits remaining at issue have been properly substantiated by reference to the petitioner's books and records and to foreign tax laws. Respondent asserts that in order to be allowed the claimed foreign tax credits, petitioner must prove that the foreign withholding taxes imposed on its net quoted loan *184 interest payments were paid to the foreign government as required by sections 901(a) and (b)(1), 905(b) and (c), and the regulations thereunder. Respondent maintains that the proper statutory, regulatory, and judicial framework for the allowance of foreign tax credits under sections 901(a) and (b)(1), 905(b) and (c) requires proof that the foreign withholding taxes were actually paid to the foreign governments. In support of this position, respondent presents four relevant arguments. First, respondent argues that foreign tax credits are allowed as a matter of legislative grace based on strict compliance with the statutes requiring proof of payment of the foreign withholding tax to the foreign government. Second, respondent argues that the statutes, regulations, and case law existing at the time of the Court's opinion in Lederman required that a foreign tax be paid to the foreign government before a tax credit was allowed. Third, respondent argues that under Lederman and Pacific Metals Corp. v. Commissioner, 1 T.C. 1028 (1943), a taxpayer may initially claim foreign tax credit for a foreign withholding tax based on evidence of withholding of a foreign tax, but remains under a duty *185 to provide respondent with proof that the foreign tax was paid to the foreign government. Fourth, respondent argues that the Lederman and Pacific Metals cases which require proof that a foreign withholding tax is paid to a foreign government are wholly consistent with sections 901(a) and (b)(1) and 905(b) and (c), and the regulations and rulings thereunder. Respondent further asserts that petitioner's books and records, showing receipt of net interest payments, do not constitute secondary evidence. In support of this assertion, respondent presents several arguments. First, respondent argues that gross quoted and net quoted loans are not "alternative pricing mechanisms which always have an identical effect on U.S. lenders and foreign borrowers." Second, respondent argues that the imposition of the foreign withholding tax and the assumption of the tax by the foreign borrower establishes only the proper accrual of the additional income and not the actual deduction of the foreign tax. Third, respondent argues that CINB's financial and tax reporting of international loans further establishes that gross quoted and net quoted loans are not "alternative pricing mechanisms," and establishes *186 that CINB knew that proof of payment of the foreign withholding taxes was required for the allowance of foreign tax credits in net quoted loans. Fourth, respondent argues that petitioner has misrepresented the purpose of the net quoted loan study and the published position of respondent on net quoted loans. Fifth, respondent argues that errors in the net quoted loan study establish that the gross-up calculation on the receipt of net interest does not constitute secondary evidence of withholding and confirms that positive proof of payment is required for the correct determination of petitioner's tax liability. [39] *187 Sixth, respondent argues that the foreign tax credits at issue have not been properly substantiated by reference to petitioner's books and records and to foreign tax laws and that evidence of the receipt of the contractual rate of interest net of foreign withholding taxes imposed by the foreign statutes establishes only that petitioner properly accrued the additional interest income representing the taxes assumed by the foreign borrowers, and does not constitute secondary evidence of withholding under section 1.905-2(b)(3), Income Tax Regs.
Respondent finally asserts that petitioner's position is that it is not "obliged to further establish that withheld taxes were, in fact, paid over to the relevant taxing jurisdiction." However, respondent argues that petitioner is not seeking a provisional or interim allowance of the $ 7,938,963 of foreign tax credits at issue under Lederman and has failed to provide evidence to support such a provisional or interim allowance. Some of the arguments made by both parties are not discussed since we do not consider them to be sufficiently convincing to warrant comment. As we noted in Nissho Iwai American Corp. v. Commissioner, 89 T.C. 765, 772-773 (1987): this case involves the unusual situation in which a taxpayer seeks to recognize income. The reason for this is because attached to the recognition of income is the potential availability of a foreign tax credit; and taxwise, the foreign tax credit is worth more than the detrimental recognition of the income.
Pursuant to section 901(b)(1), a domestic corporation is allowed to claim as a credit against its Federal income tax (subject to certain limitations not herein applicable) "the amount *188 of any income * * * taxes paid or accrued during the taxable year to any foreign country." The purpose of the foreign tax credit is to reduce international double taxation. See American Chicle Co. v. United States, 316 U.S. 450, 452, 86 L. Ed. 1591, 62 S. Ct. 1144 (1942). However, allowance of credit for foreign taxes "'paid or accrued' is an act of grace on the part of Congress," and a taxpayer seeking the benefit of such credit must establish that all the conditions upon which allowance of the credit depends have been fulfilled. Irving Air Chute Co. v Commissioner, 143 F.2d 256, 259 (2d Cir. 1944), affg. 1 T.C. 880 (1943). Section 905(b), [40] which pertains to proof of foreign tax credits, provides as follows: The credits provided in this subpart shall be allowed only if the taxpayer establishes to the satisfaction of the Secretary -- (1) the total amount of income derived from sources without the United States, determined as provided in part I, (2) the amount of income derived from each country, the tax paid or accrued to which is claimed as a credit under this subpart, such amount to be determined under regulations prescribed by the Secretary, and (3) all other information necessary *189 for the verification and computation of such credits.
In furtherance of section 905(b), section 1.905-2, Income Tax Regs., provides that in the case of a corporation, the taxpayer's return must be accompanied by a Statement in Support of Credit Claimed by Domestic Corporation for Tax Paid or Accrued to a Foreign Country or a Possession of the United States (Form 1118), which "must be carefully filled in with all the information called for and with the calculations of credits indicated." [41] *190 Sec. 1.905-2(a)(1) and (2), Income Tax Regs.Section 1.905-2(a)(2), Income Tax Regs. provides that: Except where it is established to the satisfaction of the district director that it is impossible to furnish such evidence, the form must have attached to it (i) the receipt for each such tax payment if credit is sought for taxes already paid, or (ii) the return on which each such accrued tax was based if credit is sought for taxes accrued.
Section 1.905-2(b), Income Tax Regs., provides that: (b) Secondary evidence. -- Where it has been established to the satisfaction of the district director that it is impossible to furnish a receipt for such foreign tax payment, the foreign tax return, or direct evidence of the amount of tax withheld at the source, the district director may, in his discretion, accept secondary evidence * * * * * * * * * If at any time the foreign tax receipts or foreign tax returns become available to the taxpayer, they shall be promptly submitted to the district director.
Section 905(c) provides that: If accrued taxes when paid differ from the amounts claimed as credits by the taxpayer, * * * the taxpayer shall notify the Secretary, who shall redetermine the amount of the tax for the year or years affected. * * *
Section 1.905-2(b)(3), Income Tax Regs., appears to require *191 only that the taxpayer provide either direct or secondary evidence of withholding. However, section 1.905-2(b)(3), Income Tax Regs., requires that the taxpayer must provide direct evidence of withholding and of the amount withheld by "those who have made the payments." In addition, section 1.905-2(b)(3), Income Tax Regs., cannot be read in isolation. Section 905(c) requires that the taxpayer ultimately provide evidence of payment of the withholding taxes so that the correct amount of the foreign tax credit can be determined. This Court has interpreted sections 901 and 905 and the regulations thereunder to provide that where an accrual-basis taxpayer provides evidence of withholding, the taxpayer is entitled to claimed foreign tax credits on a provisional or interim basis. However, the taxpayer must ultimately provide direct or secondary evidence of actual payment of the foreign withholding tax to the foreign government in order to be entitled to the claimed foreign tax credit, as required by sections 901(a) and (b)(1) and 905(b) and (c). Pacific Metals Corp. v. Commissioner, 1 T.C. 1028 (1943). In Pacific Metals Corp., this Court stated that: Congress anticipated the difficulty *192 of ascertaining, at the time of filing an income tax return, the exact amount of a foreign tax, and it provided a special method of making an adjustment of the foreign tax credit at such later time as the taxpayer ascertains exactly the amount of the foreign tax. Such provisions were made by section 131(c). * * * Reading (c) with (a) of section 131, the credit under (a) initially taken is a provisional or interim credit, subject to correction by the taxpayer himself. * * * The procedure to be followed by the Commissioner under section 131(c) was to make demand through his collector for payment of the amount of the tax due upon redetermination of the allowable credit. * * *
Pacific Metals Corp. v. Commissioner, supra at 1029-1030. [42]
In Lederman v. Commissioner, 6 T.C. 991 (1946), the taxpayer claimed foreign tax credits based upon evidence of withholding at the source. There was no doubt that the tax had been withheld and there was also no doubt that the withheld tax had not been paid to the foreign government. The taxpayer argued *193 that evidence of withholding at the source constitutes payment for purposes of section 131. Respondent argued that a withheld tax is only an accrued tax, and since the tax withheld had not been paid to the foreign government up to the date of promulgation of the opinion, the taxpayer could not claim a foreign tax credit for a tax paid. This Court stated pursuant to the regulations: that direct evidence of the fact that tax has been withheld at the source and of the amount withheld are satisfactory and sufficient proof to support a claim for credit, regardless of whether the claim is for tax paid or tax accrued. * * *
Lederman v. Commissioner, supra at 998. The Court decided that the taxpayer was entitled to a foreign tax credit. This holding is consistent with petitioner's argument that it is entitled to the claimed foreign tax credits where petitioner provided respondent with evidence that foreign withholding taxes were withheld. However, this Court also stated in Lederman that the Commissioner could assert in a subsequent proceeding the applicability of section 131(c), entitling the Commissioner to adjust the credit, if the withheld taxes are not actually paid to the foreign government, *194 citing Pacific Metals Corp. v. Commissioner, 1 T.C. 1028 (1943). Lederman v. Commissioner, supra at 999. This statement is consistent with respondent's position in this case that in order for petitioner to be entitled to claimed foreign tax credits, petitioner must ultimately provide respondent with evidence of payment of the withheld taxes. Under present law, petitioner may claim foreign tax credits on its tax returns based upon proof of the amount of tax withheld at the source, but the claimed credits are provisional or interim credits, which are subject to adjustment once petitioner determines the amount of withheld tax actually paid to the foreign government and provides respondent proof of actual payment of the withheld tax to the foreign government. Petitioner must provide respondent with direct evidence of payment or, if such evidence is unavailable, the district director may, in his discretion, accept secondary evidence of payment. In this proceeding no useful purpose would be served by allowing the claimed foreign tax credits on a provisional or interim basis, based upon evidence of withholding. In the last 10 years, petitioner should have been able to provide respondent *195 with evidence of payment of the withheld taxes. Also, in most of the claims for foreign tax credits, the statute of limitations for payment of the withholding taxes on the interest paid to CINB by the foreign borrowers has run in the various foreign countries. In those situations, petitioner and its foreign borrowers are no longer legally liable for payment of these withholding taxes. Therefore, evidence that the foreign taxes were withheld is irrelevant unless accompanied by evidence that the withheld taxes were actually paid, as required by section 905(c) and by this Court in Pacific Metals. Thus, we do not consider it necessary to further discuss petitioner's and respondent's arguments for and against the position that secondary evidence of withholding is sufficient to justify interim allowance of petitioner's claimed foreign tax credits. The issue before us is whether or the extent to which-respondent has abused his discretion by determining that petitioner failed to provide sufficient evidence as substantiation for allowance of the foreign tax credits. Respondent is required to abide by regulations reasonably based on statute and any failure to do so constitutes an abuse of *196 discretion. Buzzetta Construction Corp. v. Commissioner, 92 T.C. 641, 647 (1989). When reviewing discretionary administrative acts, however, the judgment of this Court may not be substituted for that of respondent. The exercise of discretionary power will not be disturbed absent an abuse of discretion. Whether respondent has abused his discretion is a question of fact. Buzzetta Construction Corp. v. Commissioner, supra at 648; Estate of Gardner v. Commissioner, 82 T.C. 989, 1000 (1984). Petitioner's burden of proof of abuse of discretion exceeds that of the usual preponderance of the evidence. Buzzetta Construction Corp. v. Commissioner, supra; Oakton Distributors, Inc. v. Commissioner, 73 T.C. 182, 188 (1979). Section 1.905-2(b)(1), (2), and (3), Income Tax Regs., describes the secondary evidence that the District Director may, in his discretion, accept in lieu of direct evidence as follows. (1) Receipt for payment. -- In the absence of a receipt for payment of foreign taxes there shall be submitted a photostatic copy of the check, draft, or other medium of payment showing the amount and date thereof, with certification identifying it with the tax claimed to have been paid, together *197 with evidence establishing that the tax was paid for taxpayer's account as his own tax on his own income. If credit is claim[ed] on an accrual method, it must be shown that the tax accrued in the taxable year. (2) Foreign tax return. -- If the foreign tax return is not available, the foreign tax has not been paid, and credit is claimed on an accrual method, there shall be submitted -- (i) A certified statement of the amount claimed to have accrued, (ii) Excerpts from the taxpayer's account showing amounts of foreign income and tax thereon accrued on its books, (iii) A computation of the foreign tax based on income from the foreign country carried on the books and at current rates of tax to be established by data such as excerpts from the foreign law, assessment notices, or other documentary evidence thereof, (iv) A bond, if deemed necessary by the district director, filed in the manner provided in cases where the foreign return is available, and (v) In case a bond is not required, a specific agreement wherein the taxpayer shall recognize its liability to report the correct amount of tax when ascertained, as required by the provisions of section 905(c). If at any time the foreign tax *198 receipts or foreign tax returns become available to the taxpayer, they shall be promptly submitted to the district director. (3) Tax withheld at source. -- In the case of taxes withheld at the source from dividends, interest, royalties, compensation, or other form of income, where evidence of withholding and of the amount withheld cannot be secured from those who have made the payments, the district director may, in his discretion, accept secondary evidence of such withholding and of the amount of tax so withheld, having due regard to the taxpayer's books of account and to the rates of taxation prevailing in the particular foreign country during the period involved.
Foreign Tax Credits Claimed Without Borrower Provided Documentation
Petitioner has conceded that it has not furnished any tax receipts as direct evidence of payment of the foreign withholding taxes and has not provided any letters from the borrowers as secondary evidence of such payment with respect to claimed foreign tax credits in the amount of $ 2,998,510. Petitioner offers as proof its stipulation that petitioner received interest income from the foreign borrowers, that the foreign tax statutes imposed the taxes, and *199 that the foreign borrowers assumed liability for the payment of the foreign withholding taxes. Petitioner also offers as secondary evidence its own books and records. Section 1.905-2(b)(3), Income Tax Regs., provides that respondent must have due regard for the taxpayer's books of account. However, petitioner has failed to provide either direct or secondary evidence of payment of foreign withholding taxes in this amount by the foreign borrower. Petitioner has failed to substantiate its entitlement to these claimed foreign tax credits. Therefore, we hold that petitioner is not entitled to foreign tax credits in the amount of $ 2,998,510. Foreign Tax Credits Documented by Borrower Letters
Petitioner offered Borrower Letters provided to CINB by nine borrowers in Argentina, the Philippines, Venezuela, and Thailand as substantiation for foreign tax credits in the amount of $ 131,294. [43] Petitioner asserts that the Borrower Letters constitute direct evidence of the amount of tax withheld at the source. In the alternative, petitioner asserts that even if the Borrower Letters are secondary evidence, they are sufficient to substantiate petitioner's entitlement to the *200 claimed foreign tax credits. In support of this assertion, petitioner argues that this Court's holding on the admissibility of the Borrower Letters provides a strong argument in favor of accepting the Borrower Letters as adequate substantiation of petitioner's foreign tax credit claims. Continental Illinois Corp. v. Commissioner, T.C. Memo 1989-468. Petitioner also asserts that the Borrower Letters are corroborated by petitioner's books and records and by the laws of the countries at issue relating to the withholding of income taxes imposed on petitioner's interest income, which in themselves are acceptable secondary evidence. Finally, petitioner asserts that respondent's rejection of the Borrower Letters because they are not tax receipts or tax returns is inherently unfair under the circumstances and a clear abuse of respondent's discretion. Respondent argues that he did not abuse his discretion by not accepting Borrower Letters as substantiation of the foreign tax credits claimed by CINB in connection with the imposition of foreign withholding taxes which are the subject of such letters. We must decide whether or not the Borrower Letters which have been received in evidence provide *201 sufficient secondary evidence of payment of the foreign tax in order to decide whether or the extent to which petitioner is entitled to the claimed foreign tax credits. The record is replete with evidence of CINB's attempts to obtain tax receipts from borrowers to whom CINB extended net quoted loans. CINB first attempted to obtain tax receipts from foreign borrowers as the final step of the net loan study. Most recently, CINB attempted without success to obtain tax receipts from the foreign borrowers in question during trial preparation for this case. CINB obtained the Borrower Letters only after CINB's attempts to obtain tax receipts from those foreign borrowers failed. We conclude that the Borrower Letters do not constitute direct evidence of proof of payment. We conclude, however, that the Borrower Letters may and in some cases do constitute acceptable secondary evidence of the amount paid. We conclude that those Borrower Letters which state that the foreign withholding taxes were both withheld and paid to foreign tax authorities by the foreign borrowers on behalf of CINB provide sufficient evidence of the amount of foreign withholding tax actually paid and provide sufficient *202 substantiation under sections 901 and 905 to entitle petitioner to the claimed foreign tax credits. Therefore, respondent abused his discretion by failing to accept these Borrower Letters as secondary evidence of the amount of foreign withholding tax actually paid by the foreign borrower on behalf of CINB. We hold that petitioner is entitled to foreign tax credits claimed with respect to those foreign borrowers which provided such evidence that the foreign withholding taxes were withheld and paid. Those foreign borrowers include Banco de Italia, Banco de Mendoza, Banco Quilmes, Banco de la Provincia, First Bangkok City Bank, and Thai Farmers Bank. [44] With respect to the other Borrowers letters which state only that the foreign withholding taxes were withheld, but do not state that such taxes were actually paid, we conclude that such Borrower Letters do not provide sufficient *203 evidence of the actual payment of such taxes. Therefore, we hold that respondent did not abuse his discretion by failing to accept these Borrower Letters as substantiation for the foreign tax credits claimed by petitioner with respect to those foreign borrowers. Those foreign borrowers include Oficina Central, Philippine National Bank, and Laem Thong Bank. Foreign Tax Credits Documented by Borrower Letters Provided to CINB by PeMex and CFE and Certain Other Documentation
Petitioner offered Borrower Letters provided to CINB by PeMex and certain other documents as substantiation for foreign tax credits in the amount of $ 3,810,713. Petitioner offered Borrower Letters provided to CINB by CFE and certain other documents as substantiation for foreign tax credits in the amount of $ 998,466. With respect to both PeMex and CFE, petitioner makes four assertions in connection with its argument that the Borrower Letters and other documents obtained constitute sufficient evidence to substantiate CINB's foreign tax credit claims. First, petitioner asserts that as a "dual capacity taxpayer," petitioner is entitled to foreign tax credits for Mexican withholding taxes which were absorbed by the *204 Mexican Government pursuant to the terms of its net loans to PeMex and CFE. Second, petitioner asserts that petitioner is entitled to these foreign tax credits since the record is clear that withheld taxes were, in fact, paid to the Mexican Government. Third, petitioner asserts that petitioner is entitled to these foreign tax credits since it has established that the withholding taxes were withheld by PeMex and CFE. Fourth, petitioner asserts that petitioner is entitled to these foreign tax credits on the same ground as an employee whose employer fails to pay withheld Federal income taxes. With respect to petitioner's first argument, we believe that petitioner has misinterpreted the meaning and scope of section 1.901-2(f)(2)(ii), Example (3), Income Tax Regs., upon which it relies. We conclude that this regulation does not apply to petitioner in this case and, therefore, no further discussion of that argument is warranted. With respect to petitioner's argument that the taxes were withheld and paid over by PeMex within the context of PeMex's special tax regime and by CFE, the record does not support this position. Mr. Samuels, U.S. counsel to PeMex, testified that Mr. Rangel and *205 Mr. Deleone, members of the PeMex Finance Department in 1979, told him that withholding taxes were not encompassed in the payments made by PeMex under the special tax regime. Respondent's primary argument is that the foreign tax credits pertaining to PeMex and CFE must be disallowed because petitioner has failed to establish legal liability for the payment of the withholding taxes as required by section 901. In support of respondent's first contention, respondent argues that the Ministry of Finance and Public Credit exempted interest payments made by PeMex and CFE to foreign lenders from the Mexican withholding tax imposed by statute. Respondent's alternative argument is that the PeMex and CFE Borrower Letters do not constitute evidence that the withholding taxes were paid to the Mexican Government as required by section 905(b) and section 1.905-2, Income Tax Regs.
A foreign tax is creditable only if the taxpayer is legally liable under foreign law for the tax. Sec. 4.901-2(g), Temporary Income Tax Regs.; [45]Biddle v. Commissioner,302 U.S. 573, 82 L. Ed. 431, 58 S. Ct. 379 (1938); Irving Air Chute Co. v. Commissioner,1 T.C. 880 (1943), affd. 143 F.2d 256 (2d Cir. 1944); Trico Products Corp. v. Commissioner,46 B.T.A. 346 (1942), *206 affd. on another issue 137 F.2d 424 (2d Cir.; 1943). PeMex
We believe that PeMex had no legal liability for payment of the withholding taxes with respect to the net loans from petitioner. PeMex, as a "decentralized public agency" of the Mexican Federal Government, was under a special tax regime, in which PeMex was subject to the obligation to pay withholding taxes on behalf of third parties. However, the record establishes that pursuant to an informal administrative understanding, PeMex was exempt from the obligation to pay these withholding taxes. Two letters to CINB from Mr. Rangel, an assessor in PeMex's Finance Administration Department, dated March 29, 1979, and from *207 Mr. Yarza, an assistant manager in the same department, dated June 11, 1979, only indicate that PeMex assumed the obligation to pay the withholding taxes. One Letter from Mr. Yarza, an assistant manager to PeMex's Finance Administraiton Department, indicates that PeMex is subject to a special system of taxation and that PeMex complies with all the obligations under that special tax regime. In a letter dated December 3, 1982, Mr. Trevino, a manager in PeMex's Finance Administration Department, said that PeMex meets its own tax obligations under a special tax regime, that PeMex is not subject to taxes which would be imposed on other Mexican companies, and that for the last 18 years, PeMex has not been required to withhold or pay any Mexican withholding taxes on behalf of nonresidents of Mexico. In 1987, Mr. Valdes asked Mr. Diaz, PeMex's deputy manager of financing, whether or not PeMex was liable for withholding taxes imposed on interest payments to CINB and, if so, whether or not such taxes were paid. Mr. Diaz stated that PeMex was liable for withholding taxes and that the December 3, 1982, letter was a mistake. Thereafter, PeMex provided CINB with a letter dated March 23, 1987, *208 stating that PeMex was responsible for paying withholding taxes on interest and indicated that PeMex did not owe the Secretaria de Hacienda y Credito Publico any money on account of withholding taxes applicable to interest payments made by PeMex according to article 154 of the Income Tax Law of Mexico. Respondent refused to accept this letter as substantiation of payment of withholding taxes by PeMex on CINB's behalf. Upon a request by Mr. Valdez that PeMex provide CINB with a letter indicating that PeMex paid withholding taxes on CINB's behalf, Mr. Diaz sent CINB a letter dated May 25, 1988, certifying that PeMex was obligated to pay withholding taxes on such interest and did pay such taxes. When respondent requested an opportunity to meet with Mr. Diaz to discuss the possibility of obtaining information and documentation concerning the payment of withholding taxes by PeMex on CINB's behalf, PeMex sent CINB a letter dated March 10, 1988, notifying CINB that PeMex withdrew its letter of May 25, 1988. Further, in the letter, PeMex stated that PeMex is a decentralized public agency and, generally, under Mexican law, interest paid to nonresidents of Mexico is subject to Mexican withholding *209 tax. PeMex also stated that PeMex met its own tax obligations under a special tax regime and was not obligated to pay which would otherwise be imposed on a Mexican company. The letter also stated that for the last 25 years, PeMex has not been required to withhold or pay any Mexican Federal or local income taxes, including the withholding of such taxes, on interest paid to nonresidents of Mexico; and nonresident Mexican recipients of interest from PeMex have not been requested to pay such taxes. Petitioner obtained two legal opinions regarding the obligations of certain borrowers, including PeMex, to withhold and pay Mexican taxes. The two legal opinions were obtained from CINB's Mexican counsel. One opinion letter indicates that PeMex is legally obligated to pay withholding taxes on behalf of CINB. The other opinion letter stated that PeMex is liable for the withholding taxes, unless expressly exempt by the Ministry of Finance and Public Credit. The record establishes that PeMex assumed the obligation, if it existed, to pay withholding taxes on interest payments made by PeMex. Even though some of the evidence indicates that PeMex was exempt from the requirement to pay withholding *210 taxes to the Mexican authorities as a result of an informal administrative understanding between PeMex and the Mexican authorities. Therefore, we conclude that PeMex probably had no legal liability for the payment of withholding taxes to the Mexican authorities and in any event made no such payment. [46] Therefore, we hold that petitioner is not entitled to foreign tax credits in the amount of $ 3,810,713. CFE
The record establishes that CFE had no legal liability for the payment of withholding taxes to the Mexican authorities. In a letter to CINB dated May 31, 1979, and a telex to CINB dated March 28, 1985, Enrique Vilar, general finance manager of CFE, indicated that the interest payments made to CINB were free of any Mexican withholding *211 tax. Upon further request from CINB representatives to provide CINB with tax receipts, CFE sent a letter dated June 18, 1987, to CINB which indicated that interest payments made to CINB in the years in issue were free of any Mexican withholding tax. The opinion letter dated June 8, 1979, discussed above also applies to CFE. We conclude that CFE probably had no legal liability for the payment of withholding taxes to the Mexican authorities and made no such payment. Therefore, we hold that petitioner is not entitled to foreign tax credits in the amount of $ 998,466. Additional Interest Income
The second issue for decision is whether, to the extent the foreign tax credits are disallowed, petitioner is entitled to a corresponding reduction of the additional interest income which was accrued and reported in connection with certain loans made to foreign borrowers. Petitioner asserts that if any of the foreign tax credits claimed by petitioner with respect to its foreign net quoted loans are disallowed, the amounts previously accrued in petitioner's income with respect to such credits must be reversed to reflect the actual nonpayment of such taxes. Petitioner refers to the holding in Acme Coal Co. v. United States,70 Ct. Cl. 696, 44 F.2d 95 (1930), *212 as support for its position. Petitioner also argues that petitioner's position is consistent with section 905(a). However, petitioner fails to distinguish between those instances where petitioner was actually subject to liability for payment of such tax and those where there was no actual liability. Petitioner's inclusion in income of the amount of foreign withholding taxes paid on its behalf by foreign borrowers is based on Old Colony Trust Co. v. Commissioner,279 U.S. 716, 73 L. Ed. 918, 49 S. Ct. 499 (1929). In that case, the Supreme Court held that the payment of Federal income taxes by an employer on behalf of its employee constituted income to the employee. The cases following Old Colony Trust Co. expanded this principle to include the payment by a third party of any obligation on behalf of a taxpayer. See Diedrich v. Commissioner,457 U.S. 191, 72 L. Ed. 2d 777, 102 S. Ct. 2414 (1982); United States v. Boston & Maine Railroad,279 U.S. 732, 73 L. Ed. 929, 49 S. Ct. 505 (1929); Acme Coal Co. v. United States, supra.
The Supreme Court in Spring City Foundry Co. v. Commissioner,292 U.S. 182, 78 L. Ed. 1200, 54 S. Ct. 644 (1934), held that income is accruable when the right *213 to receive it becomes fixed rather than at the time of its receipt and held that sales proceeds that were accrued and then later became uncollectible were includable in income during the year of accrual. As an accrual basis taxpayer, petitioner must accrue such income in the year in which the taxes become due and payable. Commissioner v. Terre Haute Electric Co.,67 F.2d 697 (7th Cir. 1933). In Resale Mobile Homes, Inc. v. Commissioner,91 T.C. 1085 (1988), this Court noted that under the accrual method of accounting, income is includable in gross income when all events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Sec. 1.451-1(a), 1.446-1(c)(1)(ii), Income Tax Regs.; Spring City Foundry Co. v. Commissioner, supra.
An accrual basis taxpayer must report income in the year the right to such income accrues, despite the necessity for mathematical computations or ministerial acts. George K. Herman Chevrolet, Inc. v. Commissioner,39 T.C. 846, 850 (1963). Where an amount is properly accrued on the basis of a reasonable estimate and the exact amount is later determined, any difference may be included in income *214 or deducted, as appropriate, in the year in which the correct amount is determined. Sec. 1.451-1(a), Income Tax Regs.; Continental Tie & Lumber Co. v. United States,286 U.S. 290, 76 L. Ed. 1111, 52 S. Ct. 529 (1932). Where an amount is improperly accrued, the taxpayer is entitled to reduce the reported additional income. Commercial Solvents Corp. v. Commissioner,42 T.C. 455, 471 (1964); American Fork & Hoe Co. v. Commissioner,33 B.T.A. 1139, 1149 (1936); Atlantic Coast Line Railroad Co. v. Commissioner,31 B.T.A. 730, 751 (1934), affd. 81 F.2d 309 (4th Cir. 1936). Section 1.451-1(a), Income Tax Regs., provides that: Where an amount of income is properly accrued on the basis of a reasonable estimate and the exact amount is subsequently determined, the difference, if any, shall be taken into account for the taxable year in which such determination is made. * * * Similarly, if a taxpayer ascertains that an item was improperly included in gross income in a prior taxable year, he should, if within the period of limitation, file claim for credit or refund of any overpayment of tax arising therefrom. Respondent contends that the amount of $ 3,132,804, previously accrued in petitioner's *215 income with respect to the disallowed foreign tax credits, was properly accrued and should not be reversed solely because petitioner could not prove that the foreign withholding taxes were paid. In support of this assertion, respondent argues that once properly accrued, an income item remains accrued even if the income item later becomes uncollectible, citing Spring City Foundry Co. v. Commissioner,292 U.S. 182, 78 L. Ed. 1200, 54 S. Ct. 644 (1934). Respondent further argues that only a contingency as to liability and not as to payment will defeat accrual. Respondent argues that the holding in Acme Coal Co. applies only to income that is erroneously accrued. Respondent argues that section 905(c) applies only to foreign tax credit claims and not to the accrual of income. Respondent finally argues that section 166 provides a mechanism to ameliorate the effects of proper income accruals. We agree with respondent. Respondent also asserts that the amount of $ 4,809,179 (i.e., $ 3,810,713 from PeMex and $ 998,466 from CFE) previously accrued in petitioner's income with respect to the disallowed foreign tax credits was improperly accrued because PeMex and CFE had no legal liability for *216 the foreign withholding tax imposed on interest payments made by PeMex and CFE on behalf of CINB. Therefore, respondent concedes that petitioner is entitled to reduce its reported additional interest income accordingly. We accept respondent's concession. With respect to the income accruals in the amount of $ 3,132,804, petitioner conceded that such accruals were proper. The foreign borrowers assumed the liability to pay the foreign withholding tax. Therefore, such amount was properly included in petitioner's income in the years in issue. There were no contingencies as to the liability. Petitioner accrued the income when the right to receive it became fixed. The fact that petitioner failed to substantiate the claimed foreign tax credits and the subsequent disallowance of such foreign tax credits does not effect the accrual of this income. As respondent noted, petitioner may seek a deduction under section 166 for the reported additional income at issue. We hold that petitioner is not entitled for its years 1977, 1978, and 1979 to reduce its reported additional interest income in the amount of $ 3,132,884. We conclude that petitioner's income accruals were improper for the amount *217 of $ 4,809,179 of additional interest income reported on petitioner's returns because PeMex and CFE had no legal liability for payment of the foreign withholding taxes. Respondent concedes that if this Court accepts the argument that petitioner had no legal liability with respect to the amount of $ 4,809,179, then the accrual of income in this amount was improper. Therefore, we hold that petitioner may reduce its reported additional interest income in the amount of $ 4,809,179. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.
2. The record in this case contains translations of various provisions of foreign law and certain other documents originating with foreign borrowers upon which we rely. Presumably, the translations provided by the parties and their expert witnesses accurately reflect the contents of the foreign language materials.↩
3. In some instances, borrowers with gross quoted loans outstanding remitted interest payments at the gross quoted rate, paid the corresponding withholding taxes, and then submitted a tax receipt pursuant to which reimbursement was made by CINB.↩
4. That exception is a loan in the amount of $ 15 million which CINB made to Petroleos Mexicanos (PeMex) on May 31, 1973, for a term of 10 years. The loan agreement required interest payments to be made on the unpaid principal balance semiannually at a rate of interest 3/4 of 1 percent over LIBOR. The loan agreement required repayment of principal to be made in 13 semiannual installments commencing on May 31, 1977. The provision of the loan agreement pertaining to the payment of taxes provided that: (g) All payments of principal and interest on the Note shall be made in lawful money of the United States of America, without set-off or counterclaim and free and clear of, and without deduction for, any tax, or other charge of any nature, imposed on such payments by or on behalf of the government of any jurisdiction (other than the United Kingdom) or any political subdivision or agency thereof or therein, except to the extent of a deduction for income or withholding tax, if any, imposed by the laws of Mexico on or with respect to any such payment (herein called "Mexican Tax"). PEMEX shall, immediately after the payment by it of any Mexican Tax, transmit to the Bank a receipt executed by the appropriate authorities of Mexico evidencing such payment or other documentary evidence of such payment satisfactory to the Bank. If for any reason whatsoever a credit, in the full amount of any Mexican Tax, on the Bank's United States income tax for the year in which such Mexican Tax is paid is unavailable to the Bank or is disallowed, PEMEX shall forthwith upon the Bank's request (whether made before or after payment in full of the Note) reimburse the Bank in such amount as may be necessary to net the Bank, after all applicable income and withholding taxes (U.S. and other), an amount equal to all such income and withholding taxes payable by the Bank or on the Bank's behalf as a result of such unavailability or disallowance and as a result of any such reimbursement. The phrase "Bank's United States income tax" shall mean, with respect to any year for which a consolidated United States income tax return is filed, the consolidated United States income tax liability of the Bank and its affiliates. The $ 15 million loan to PeMex cannot be considered either a net quoted loan or a gross quoted loan because aspects of both of those types of loans are included in the above-quoted provision which pertains to the payment of taxes. However, with respect to the withholding taxes in issue in this case, that loan constitutes a gross quoted loan because the loan agreement called for interest payments to be made at a gross quoted rate net of such taxes.↩
5. We recognize that withholding is merely a system for collecting a type of tax (such as an income tax) and the "withholding tax" is not a tax per se. We and the parties use this terminology for convenience. ↩
6. Petitioner maintains that interest due from PeMex and Comision Federal de Electricidad (CFE) was subject to withholding tax. Respondent, on the other hand, maintains that withholding tax was not imposed on interest due from those two Mexican borrowers. For that reason and others, more particularized findings of fact will be made with respect to CINB's dealings with PeMex and CFE. 7. Borrowers never actually withheld tax from interest payments made to CINB under net quoted loan agreements. The assumption by borrowers of the obligation to pay foreign tax imposed on interest paid or due to CINB under net quoted loan agreements eliminated the need for withholding at the source. ↩
8. Mr. Yeager, the witness upon whose testimony we based this particular finding of fact, only knew that foreign tax authorities had not made any attempt to collect unpaid withholding taxes from CINB since July 1985. Mr. Yeager speculated that that held true for the period after he began working for CINB in 1981 and before he was promoted in July 1985. Mr. Yeager apparently had no idea whether foreign tax authorities made any attempt to collect unpaid withholding taxes from CINB prior to 1981.↩
9. See Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729, 73 L. Ed. 918, 49 S. Ct. 499 (1929); sec. 1.901-2(f)(2)(ii) Example 1, Income Tax Regs. Thus, for example, if a net quoted loan agreement required an interest payment of $ 10 net of foreign tax, and the tax rate was 20 percent, then the gross-up adjustment would be $ 2.50 so that the tax would be computed on an interest payment of $ 12.50 ($ 12.50 X 20% = $ 2.50). Such a situation results in a total interest payment in the amount of $ 12.50 because the lender receives $ 10 directly from the borrower and $ 2.50 indirectly by virtue of the borrower's payment of taxes imposed on the interest paid or due to the lender.
10. The parties reached a settlement regarding whether a gross-up adjustment was required with respect to net quoted loans to Mexican borrowers. See infra↩ note 34.
11. Absent from the record is any evidence indicating whether the statutes of limitations in the other seven countries, i.e., Egypt, Hong Kong, Ivory Coast, Lebanon, Morocco, New Zealand, and Singapore, remain open.↩
12. Petitioner maintains that proof of payment of withholding taxes to the proper governmental authorities is not a prerequisite for allowance of foreign tax credits since borrowers were required to withhold such taxes at the source. See supra↩ note 7.
13. As a result of the net loan study, CINB claimed a substantial refund for the taxable years 1969 through 1973, which is the subject of a refund suit currently pending before the United States District Court for the Northern District of Illinois. CINB received a refund in the amount of $ 13,100,000 in connection with the foreign tax credits claimed for the taxable years 1974 through 1976.
14. We assume that for financial and tax reporting purposes the classification of net quoted loans as either gross loans or net loans depended upon the results of the net loan study. ↩
15. The total amount includes approximately $ 2 million of both additional interest income and foreign tax credits attributable to loans made to Brazilian borrowers.↩
16. Obviously, passage of time was not a problem with respect to the years in issue in this case because the net loan study was being conducted during those years. However, the situation was different for earlier years which date back to 1969.↩
17. Mr. Valdes' efforts to secure foreign tax credit documentation extended to foreign tax credits in issue in this case and in the refund suit involving the years 1969 through 1973. See supra↩ note 13.
18. Mr. Yeager's efforts to secure foreign tax credit documentation extended to foreign tax credits in issue in this case for the years 1977, 1978, and 1979 and in the refund suit involving the years 1969 through 1973. See supra↩ note 13.
19. CINB calculated the amounts of additional interest income and foreign tax credits which remain in issue, i.e., certain amounts claimed on petitioner's returns and certain other amounts claimed by petitioner in its Second Amended Petition, by applying what was believed to be the prevailing withholding tax rate to the interest payments made by borrowers, with or without an adjustment to reflect assumption by those borrowers of the obligation to pay withholding taxes on CINB's behalf, depending on the particular borrower. Since calculating those amounts, the parties have filed a revised stipulation of facts setting forth the net interest payments made by borrowers to CINB and the prevailing withholding tax rates which applied to those interest payments. We expect the parties to account for any discrepancies attributable to revision of the stipulation of facts in the Rule 155 computations.
20. Joint Exhibit 395-CT consists of schedules setting forth by country and by year the amount of additional interest income and the amount of foreign tax credits remaining in issue in this case. The amount of additional interest income in issue equals the amount of foreign tax credits in issue; therefore, those amounts are not separately identified in the schedules. The same information is presented in a somewhat different manner in the Third Supplement to Third Stipulation of Facts (Net Loan Issues), paragraphs 3 through 6, filed November 11, 1989. A $ 20 discrepancy exists between the sum of the total amounts set forth in those paragraphs ($ 131,294 + $ 3,810,713 + $ 998,466 + $ 2,998,510 = $ 7,938,983) and the sum of the total amounts set forth in the above-mentioned schedules ($ 2,418,663 + 3,275,739 + $ 2,244,561 = $ 7,938,963). We expect the parties to account for that discrepancy in the Rule 155 computations.↩
21. Joint exhibit 394-CS consists of schedules setting forth by country, by borrower, and by year the amount of additional interest income and the amount of foreign tax credits remaining in issue in this case. The amount of additional interest income in issue equals the amount of foreign tax credits in issue, therefore, those amounts are not separately identified in the schedules. The same information is presented in a somewhat different manner in paragraph 3 of the Third Supplement to Third Stipulation of Facts (Net Loan Issues) filed November 11, 1989. A $ 2,936 discrepancy exists between the sum of the total amounts set forth in that paragraph ($ 131,294) and the sum of the amounts set forth for the nine borrowers in question in the above-mentioned schedules ($ 134,230). We expect the parties to account for that discrepancy in the Rule 155 computations.
22. Presumably, that tax receipt, a copy of which was not made a part of the record in this case, reflects payment of withholding taxes in the amount of $ 2,276 by Banco de Italia on CINB's behalf. Petitioner claimed that amount as a foreign tax credit on its 1979 return. Respondent disallowed the foreign tax credit in the notice of deficiency, but subsequently allowed such credit during trial preparation. We assume respondent allowed a credit for foreign taxes after petitioner substantiated the claim to such credit with the tax receipt reflecting payment of withholding taxes in the amount of $ 2,276 by Banco de Italia on CINB's behalf. Neither the identity of the particular person to whom Banco de Italia provided the tax receipt nor the date when such receipt was provided can be ascertained from the record.↩
23. The amount set forth in the column entitled "Taxes Withheld" for 1978 does not equal the amount of foreign tax credit remaining in issue for that year. The amount of foreign tax credit (and the amount of additional interest income) remaining in issue exceeds the amount identified in the Borrower Letter as "Taxes Withheld" by $ 996 ($ 4,567 -- $ 3,571).↩
24. Banco Quilmes provided one tax receipt. Presumably, that tax receipt, a copy of which was not made a part of the record in this case, reflects payment of withholding taxes in the amount of $ 4,087 by Banco Quilmes on CINB's behalf. Petitioner claimed a foreign tax credit in the amount of $ 4,863 on its 1977 return and such credit was not disallowed by respondent. We assume respondent did not disallow that foreign tax credit because petitioner substantiated the claim to such credit with the tax receipt reflecting payment of withholding taxes in the amount of $ 4,087 by Banco Quilmes on CINB's behalf. Neither the identity of the particular person to whom Banco Quilmes provided the tax receipt nor the date when such receipt was provided can be ascertained from the record.↩
25. The total amount of additional interest income and the total amount of foreign tax credits remaining in issue as reflected in Joint Exhibit 394-CS includes $ 268 which is not otherwise accounted for in the record. We expect the parties to account for that $ 268 in the Rule 155 computations.↩
26. Oficina Central provided one tax receipt. Presumably, that tax receipt, a copy of which was not made a part of the record in this case, reflects payment of withholding taxes in the amount of $ 9,461 by Oficina Central on CINB's behalf. Petitioner claimed a foreign tax credit in the amount of $ 9,461 on its 1979 return. Respondent disallowed the foreign tax credit in his notice of deficiency, but subsequently allowed such credit during trial preparation. We assume respondent allowed a credit for foreign taxes after petitioner substantiated the claim to such credit with the tax receipt reflecting payment of withholding taxes in the amount of $ 9,461 by Oficina Central on CINB's behalf. Neither the identity of the particular person to whom Oficina Central provided the tax receipt nor the date when such receipt was provided can be ascertained from the record.
27. PNB provided one tax receipt. Presumably, that tax receipt, a copy of which was not made a part of the record in this case, reflects payment of withholding taxes in the amount of $ 28,456 by PNB on CINB's behalf. Petitioner claimed a foreign tax credit in the amount of $ 28,456 on its 1978 return and such credit was not disallowed by respondent. We assume respondent did not disallow that foreign tax credit because petitioner substantiated the claim to such credit with the tax receipt reflecting payment of withholding taxes in the amount of $ 28,456 by PNB on CINB's behalf. Neither the identity of the particular person to whom PNB provided the tax receipt nor the date when such receipt was provided can be ascertained from the record.↩
28. The telefax dated June 23, 1988, referred to CINB's earlier telefax dated June 17, 1988, and a telefax from First Bangkok City Bank dated June 20, 1988. First Bangkok City Bank's telefax dated June 20, 1988, was neither offered into evidence by petitioner nor stipulated as a joint exhibit of both parties.↩
29. It also appears that the amount listed in the "Net Interest Paid" column of such schedule for 1977 should have been $ 38,521 rather than $ 115,562.97
30. On brief, respondent asserts that the total amount of additional interest income and the total amount of foreign tax credits remaining in issue with respect to First Bangkok City Bank both equal $ 26,985.↩
31. Presumably, the schedule prepared by representatives of CINB and petitioner's counsel included amounts of "Net Interest Paid," "Taxes Withheld," and "Gross Interest Paid" for 1979. However, those amounts are not listed on the schedule attached to Thai Farmer Bank's Borrower Letter. We assume that Mr. Divari made that change in the schedule because of the purported withholding tax exemption for 1979.↩
32. The schedule attached to Thai Farmers Bank's Borrower Letter does not reflect the amount of "Taxes Withheld" which is in issue for 1979. See supra↩ note 21.
33. Another form approved for the purpose of paying over withholding taxes is Form HISR 125.↩
34. Beginning January 1, 1981, article 144 of the Federal Income Tax Law requires net quoted loan borrowers to compute withholding taxes on interest as adjusted to reflect the borrower's obligation to pay taxes on the lender's behalf. Neither article 144 of the Federal Income Tax Law nor any comparable provision was in effect during the years in issue. Thus, uncertainty clouded the issue of whether net quoted loan borrowers in Mexico made, or were required to make, gross-up adjustments of interest payments prior to computing withholding taxes. The parties resolved the gross-up adjustment issue with respect to Mexico borrowers pursuant to the Second Supplement to Third Stipulation of Facts (Net Loan Issues) Stipulation of Settled Issue filed June 13, 1989.↩
35. For purposes of this litigation, the parties stipulated that the tax imposed on interest income by the Federal District was creditable under section 901 or section 903.↩
36. Article 6 of the Federal Revenue Law of 1977 required only the authorization of the Ministry of Programming and Budget for PeMex to invest in designated securities.↩
37. During their trip to Mexico, Messrs. Valdes and Vlach participated in "several productive discussions with high ranking officials at the Secretaria de Hacienda y Credito Publico and the Mexican Central Bank." Mr. Vlach discussed "the possibility of obtaining copies of 1977-1979 years tax receipts" with Gilberto Luna, deputy director at Direccion General de Credito Publico at Secretaria de Hacienda y Credito Publico. Respondent offered into evidence as respondent's Exhibit CR the "trip report" prepared by Mr. Vlach, which reflected that such discussions took place. Petitioner offered no documents or testimony pertaining to the possibility of obtaining tax receipts from the Mexican tax authorities, or the nature and extent of CINB's efforts in that regard.↩
38. The difference between the amount of foreign tax credits petitioner claimed on its return ($ 468,955) and the amount of foreign tax credits petitioner conceded ($ 127,529) equals $ 341,426. Nevertheless, the parties stipulated that the amount of additional interest income and the amount of foreign tax credits remaining in issue with respect to CFE for 1978 both equal $ 341,356.↩
39. The concept that an error can establish a fact is difficult for us to understand.
40. Section 905(b) was amended during the years in issue. The deleted parts of section 905(b)↩ are not relevant to this case.
41. Pursuant to Notice 88-65, 1988-1 C.B. 552, the Internal Revenue Service announced the initiation of an effort to analyze compliance levels for foreign tax credits and the commencement of a study of the current system for claiming foreign tax credits. In that same notice, the Internal Revenue Service also announced the suspension of the first sentence of section 1.905-2(a)(2), Income Tax Regs., and all of section 1.905-2(b), Income Tax Regs.↩, effective January 1, 1988.
42. Section 131(a) and (c) of the Revenue Act of 1936, ch. 690, tit. I, 49 Stat. 1648, are the earlier versions of sections 901 and 905(c), respectively.↩
43. See supra↩ note 21.
44. We have pointed out in our Findings of Fact that petitioner made certain errors in several of the schedules. Thus even though we hold that the secondary evidence is adequate, the amount of foreign tax credits to which petitioner is entitled must be corrected to correct these errors. See supra pp. 39, 41, and 42↩.
45. In November 1980, the Internal Revenue Service issued temporary regulations which set forth requirements for, and limitations on, the amount of foreign tax credit. See 45 Fed. Reg. 75647 (Nov. 17, 1980.) These temporary regulations, sec. 4.901-2 et seq., generally were made applicable to taxable years ending after June 15, 1979. Final regulations under sec. 901 were made effective for taxable years beginning after November 14, 1983, T.D. 7918, 1983-2 C.B. 113. Sec. 4.901-2↩ applies to the year 1979 year at issue.
46. The record is not clear whether petitioner had any legal liability to the Mexican Federal Government for taxes on its income. We are convinced that the special tax regime did not include provision for the collection by the Mexican Federal Government of withholding taxes from petitioner. It is possible that this special tax regime was intended to relieve petitioner of its income tax liability, but we cannot make such a finding of fact on this record.↩